PRESS BROADCASTING COMPANY, INC., Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

Rainbow Broadcasting, Ltd., Intervenor.

No. 94–1439.

United States Court of Appeals, District of Columbia Circuit.

Argued April 17, 1995.

Decided July 21, 1995.

Harry F. Cole, Washington, DC, argued the cause for the appellant.

James M. Carr, Counsel, F.C.C., Washington, DC, argued the cause for the appellee. On brief were Christopher J. Wright, Deputy General Counsel, and Daniel M. Armstrong, Associate General Counsel, F.C.C., Washington, DC. Laurence N. Bourne, Counsel, F.C.C., Washington, DC, entered an appearance.

Margot Polivy and Katrina Renouf, Washington, DC, were on brief for the intervenor.

Before: SILBERMAN, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

This case is the latest in a decade-long series of disputes over a permit the Federal Communications Commission (FCC or Commission) awarded to Rainbow Broadcasting, Inc. (Rainbow) to construct a television station in Orlando, Florida. At issue is the FCC's reversal of its Video Services Division decision and the extension of Rainbow's construction permit over the objection of Press Broadcasting Company, Inc. (Press) that improper *ex parte* contacts influenced the proceeding. Press now petitions for review, renewing its challenge to the *ex parte* contacts and arguing that the Commission's decision was arbitrary and capricious. Although we conclude that the Commission's decision was not tainted by the contacts, we believe that substantial and material questions regarding Rainbow require reconsideration. We therefore grant Press's petition and remand the matter to the Commission.

## I. BACKGROUND

The FCC awarded the construction permit to Rainbow in 1984 following a competitive proceeding with two other applicants. Rainbow delayed the start of construction pending a lengthy and ultimately unsuccessful challenge to the license adjudication in this court and the Supreme Court that lasted through 1990 based on the FCC's policy of giving preference in license adjudications to minority applicants. *Winter Park Communications, Inc. v. FCC*, 873 F.2d 347 (D.C.Cir.1989), *aff'd sub nom. Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990). The permit expired in April 1988 during the pendency of the litigation, Joint Appendix (JA) 19, and the Commission cancelled it in June 1988. *See* JA 20. The FCC reinstated the permit after Rainbow explained the ongoing litigation but did so on the condition that Rainbow file a formal application for extension of time. *Id.* The FCC explained "[s]ince the pendency of an appeal does not operate as an automatic stay, you should have filed an application ... for additional time within which to construct." *Id.* Rainbow subsequently applied for and received four extensions at six-month intervals. JA 21 (July 1988 application); JA 33 (May 1989 application); JA 36 (November 1989 application); JA 40 (May 1990 application).

The Supreme Court denied rehearing of the minority preference case in August 1990, ending the litigation. 497 U.S. 1050, 111 S.Ct. 15, 111 L.Ed.2d 829 (1990). Rainbow did not begin construction of the station but instead started another round of litigation, suing Guy Gannett Publishing Company (Gannett), the owner of the transmission tower it planned to use. Rainbow claimed that it had the exclusive right to use the tower's top television broadcasting space, which Gannett had also rented to Press. *See Rey v. Guy Gannett Publishing Co.*, 766 F.Supp. 1142, 1143 (S.D.Fla.1991). Soon afterward, Rainbow asked the FCC for a fifth extension of its construction permit on the ground that "[a]ctual construction has been delayed by a dispute with the tower owner which is the subject of legal action in the United States District Court for the Southern District of Florida." JA 45. The Commission in February 1991 granted an extension through August 5, 1991. JA 64.

Unaware that Rainbow's application for an extension had been granted, Press filed an "informal objection" with the Commission arguing that the dispute over the tower did not prevent Rainbow from beginning construction. JA 67. When it learned that the FCC had approved Rainbow's application, Press filed a petition for reconsideration. JA 95. The FCC did not rule on the petition. The Florida district court denied Rainbow's motion for an injunction in the tower dispute in June 1991. *Rey*, 766 F.Supp. at 1143. The district court denied the motion based in part on its conclusion that Rainbow had not demonstrated irreparable harm inasmuch as it "has yet to obtain financing, has not selected or purchased an antenna, has not selected a wave guide, has not selected a transmitter, has not obtained building plans for a broadcast building and has not gone on the air." *Id.* at 1148. Rainbow then filed for a sixth extension in June 1991, promising to begin construction immediately and to commence operation by December 31, 1992. JA 116. Rainbow began construction of its transmitter building in July 1991 and continued construction through and after the August 5th expiration of its previous extension. JA 128–29.

Rainbow completed construction of the transmitter building in November 1991. *Id.* During the same month, Rainbow petitioned the FCC for permission to assign its permit to a new Rainbow group reorganized to provide additional financing. JA 132. Press again objected, arguing that Rainbow had misrepresented the nature of the tower litigation and was not financially qualified to construct the station. JA 143–44. Nothing happened for nearly eighteen months. In March 1993 the FCC's Video Services Division wrote Rainbow to inquire as to the status of the project, noting Rainbow's earlier commitment to complete construction by December 1992. JA 168. Rainbow responded that it could not use its new capital until the Commission approved its petition to transfer the permit to the new ownership group. JA 170. On June 18, 1993 the Video

Services Division finally granted Press's objections and cancelled Rainbow's permit. JA 13–14.

The *ex parte* contacts arose from attempts to reverse the cancellation. The first contact involved Antoinette Cook, senior counsel to the Subcommittee on Communications of the United States Senate Committee on Commerce, Science and Transportation.[1] *In re Rainbow Broadcasting Co.*, 9 F.C.C.R. 2839, 2843 (1994). In late June 1993, at the request of Rainbow's counsel, Margot Polivy, Cook telephoned Roy Stewart, the chief of the FCC Mass Media Bureau (which includes the Video Services Division).[2] *Id.* at 2843. Cook asked Stewart to explain whether the cancellation was consistent with the FCC policy encouraging minority ownership of broadcast stations. *Id.* Stewart promised to look into the matter and get back to her. JA 298–99.

The second *ex parte* contact occurred a few days later on July 1, 1993 at a meeting in Stewart's office involving Polivy, Rainbow president Joseph Rey and a number of FCC officials. The FCC attenders were Stewart, Video Services Division chief Barbara Kreisman, Television Branch chief Clay Pendarvis and Paul Gordon, a Television Branch lawyer with responsibility for the Rainbow matter. JA 333. Polivy had previously attempted to discuss the permit with Gordon but he had refused to do so, telling her that he could not discuss the merits of the case because it was restricted under the Commission's *ex parte* rules. JA 337.[3] During the meeting, the participants discussed the substance of the cancellation, JA 333, and, according to Press, the FCC participants advised Rainbow how to obtain favorable reconsideration. At the

end of the meeting, Stewart advised Polivy to file a petition for reconsideration of the cancellation and to serve Press with a copy. JA 338.

Rainbow filed its petition the next day. JA 194. One month later Stewart, acting for the Mass Media Bureau, granted the petition as well as an eight-month extension to construct the station. JA 16–18. Press filed an "emergency petition" to vacate Stewart's action, arguing that the *ex parte* contacts had tainted the adjudication. JA 236. The Mass Media Bureau recused itself and reassigned the matter to the FCC's Office of General Counsel, which forwarded the matter to the full FCC for *de novo* review.[4] 9 F.C.C.R. at 2840 n. 5.

The Commission granted Rainbow's petitions to extend its construction deadline and to assign its permit, filed in June and November 1991 respectively. The Commission's action effectively vacated the Video Services Division's cancellation of the permit. It agreed with Press that the contacts were improper and violated its *ex parte* rules, *id.* at 2843, but concluded that the violation was "mitigated by Rainbow's sincere belief that the contact was permissible." *Id.* at 2845. On the merits, the Commission concluded that Rainbow was presumptively entitled to a period of 24 months to construct its station under 47 C.F.R. § 73.3598. The FCC reasoned that Rainbow had only 10 months to construct between the Supreme Court's denial of rehearing in August 1990 and the filing of its sixth extension application. *Id.* The FCC explained that the lengthy period during which the sixth extension petition was pending, from June 1991 on, should not count

---

1. Press further notes, and the Commission does not dispute, that Cook is the stepdaughter of Vernon Jordan, who directed President Clinton's transition team.

2. Polivy told investigators from the FCC inspector general's office that she had asked Cook to investigate the permit cancellation and that she knew Cook as a former client and as a friend. JA 336.

3. Before the meeting, Gordon expressed his concern to Pendarvis and Kreisman that holding the meeting without informing Press's counsel would

be an *ex parte* violation. JA 337. Per arvis believed the meeting was not restricted because Press had filed only an informal objection to Rainbow's application. JA 338.

4. In the interim, Press filed two mandamus petitions with this court. We denied both petitions but partially granted Press's request for subpoenas to obtain information regarding the *ex parte* contacts. *In re Press Broadcasting Company, Inc.*, No. 93–1684, 1993 WL 558040 (D.C.Cir. December 8, 1993); *In re Press Broadcasting Company, Inc.*, No. 93–1867, 1994 WL 88184 (D.C.Cir. March 4, 1994); *In re Press Broadcast-*

against Rainbow inasmuch as an applicant cannot rely on construction occurring after its permit expires to support an extension petition. *Id.*

In response to Press's claims that Rainbow had misrepresented the nature of the tower litigation and was financially unqualified, the FCC concluded "no substantial and material question of fact had been raised as to whether Rainbow made misrepresentations to the Commission regarding the nature of the tower dispute," *id.* at 2847, and that "Press has not made a *prima facie* case that Rainbow lacked the requisite assurance of financing." *Id.* at 2848. Finally, the Commission granted Rainbow's assignment application. *Id.*

## II. DISCUSSION

Press contends that the *ex parte* contacts indelibly tainted the FCC's adjudication of Rainbow's permit and that the Commission's decision on the merits was arbitrary and capricious. The *ex parte* contacts require us to consider two discrete questions: whether (1) the contacts so tainted the FCC as to make its adjudication unfair and (2) the Commission reasonably determined that Rainbow "sincerely believed" that the contacts were permissible. Although we conclude that the contacts did not taint the Commission's *de novo* review, we believe that the FCC's finding with respect to Rainbow's conduct was unreasonable and remand for further proceedings.

### A. *Ex Parte Contacts*

■ The FCC agreed with Press that Rainbow violated the Commission's *ex parte* rules, finding that Press's February 1991 petition to reconsider the grant of Rainbow's

fifth extension application had restricted the proceedings under Commission regulations.[5] 9 F.C.C.R. at 2844.[6] The issue for the court is thus "whether, as a result of improper ex parte communications, the agency's decision-making process was irrevocably tainted so as to make the ultimate judgment of the agency unfair, either to an innocent party or to the public interest that the agency was obliged to protect." *PATCO v. Federal Labor Relations Auth.*, 685 F.2d 547, 564 (D.C.Cir.1982) (footnote omitted). We conclude the FCC's adjudication was not so tainted in light of the Mass Media Bureau's recusal and the full Commission's *de novo* review.

We have previously recognized that an improper attempt to influence an adjudication is not a concern if it does not reach the ultimate decision maker. "[J]udicial evaluation of the pressure must focus on the *nexus* between the pressure and the actual decision maker." *ATX, Inc. v. United States Dep't of Transp.*, 41 F.3d 1522, 1527 (D.C.Cir.1994) (emphasis in original); *see also Peter Kiewit Sons' Co. v. United States Army Corps of Eng'rs*, 714 F.2d 163, 170–71 (D.C.Cir.1983). We agree with the FCC that Rainbow's contacts extended only to persons who played no role in the Commission's ultimate decision. *See* 9 F.C.C.R. at 2839 n. 1 ("[O]ur decision is based on an independent review of the record in this proceeding and has been undertaken without participation by the Chief, Mass Media Bureau, or his staff, who are recused from this matter."); *id.* at 2843 n. 19 ("Chairman Hundt did not join the Commission until November of 1993, and therefore is not tainted. Neither Commissioner Quello nor Commissioner Barrett nor their staffs were contacted by Rainbow or anyone acting of Rainbow's behalf concerning this case.").[7] Ac-

*ing Company, Inc.*, No. 93–1867, 1994 WL 405766 (D.C.Cir. June 2, 1994).

5. 47 C.F.R. § 1.1208 prohibits *ex parte* presentations in restricted proceedings. The regulation defines "restricted" proceedings to include, when *formally* opposed or set for hearing, "[a]ny adjudicative proceeding, including any proceeding conducted pursuant to . . . section 316 (modification of construction permits or licenses) of the Communications Act."

6. Rainbow contends that Press as intervenor has no standing to challenge the Commission's actions regarding its permit. The argument has no

merit. As the FCC properly noted, nothing in its precedent supports that interpretation, 9 F.C.C.R. at 2844 & n. 24, and we necessarily recognized Press's standing in our disposition of its earlier mandamus petitions. Indeed, the initial cancellation of Rainbow's permit occurred in the process of granting Press's objections. JA 15.

7. Press argues that FCC chairman Hundt should have recused himself in light of his public comments at a 1994 conference of the National Urban League that Vernon Jordan had "been invaluable to me during my tenure as Chairman of the FCC" and "provides strong and thoughtful counsel." JA 461. We agree with the Commis-

cordingly, in the absence of a nexus between Rainbow's attempt to influence and the Commission, we conclude that the agency's decisionmaking process was not irrevocably tainted.

We note that the record comes close to establishing that *ex parte* contacts impermissibly "intruded into the calculus of consideration of the individual decisionmaker" irrespective of the lack of contact between Rainbow and the full Commission in two ways. *Kiewit*, 714 F.2d at 170 (internal quotation marks omitted). First, the record suggests that Rainbow's *ex parte* meeting with FCC staff may have assisted it in developing the argument, ultimately found persuasive by the Commission, that Rainbow had not received a 24–month construction period. The proposition apparently first arose at the *ex parte* meeting between Rainbow and the FCC officials.[8] Although the evidence establishes that the participants discussed the "substance" of the matter, JA 33, it does not establish conclusively that the FCC staff assisted Rainbow in preparing its "best" case to present to the Commission.

Second, we held in *ATX* that "[i]f the decision maker were suddenly to reverse course or reach a weakly-supported determination ... we might infer that pressure did influence the final decision." 41 F.3d at 1529.[9] The Mass Media Bureau's quick reinstatement of Rainbow's permit on the basis of flawed reasoning, as discussed *infra*, falls squarely within the holding of *ATX* and we might well have granted Press's petition without remand had the adjudication stopped there. The Bureau's recusal and Commission's *de novo* review of the matter ultimately defeats the inference of improper influence, however, because Press did not establish any contact between Rainbow and the FCC decision makers.

### B. Rainbow's Conduct

■ Although it recognized that Rainbow's *ex parte* contacts violated its rules, the Commission declined to disqualify or sanction Rainbow. It explained "recognizing that Rainbow's counsel apparently sincerely believed that the proceeding was not restricted and has advanced a plausible argument in support of that belief, we conclude that no sanction should be imposed." 9 F.C.C.R. at 2843. Press contends that the notion that Rainbow and its counsel "sincerely believed" the matter to be unrestricted is contrary to the facts of the case and we agree. The record establishes that Rainbow could not reasonably have believed the proceeding to be unrestricted because the FCC had repeatedly informed Rainbow's counsel that it considered the adjudication to be restricted within the meaning of its *ex parte* rules.

In October 1991 the Commission provided Polivy with a copy of its response to a letter from George Daniels, a Florida resident who had written the FCC in support of Rainbow. See JA 127 (Daniels letter). The FCC informed Daniels that it had handled his letter "in keeping with the Commission's *ex parte* rules, which deal with communications relative to the outcome of *all 'restricted' proceedings* under consideration by the Commission." JA 124 (emphasis added). The letter left no room for doubt that the FCC considered its *ex parte* rules applicable to the adjudication. Similarly, Gordon, an FCC lawyer, repeatedly informed Polivy that he considered the proceeding restricted, as described by the FCC inspector general:

> The attorney in the MMB [Mass Media Bureau] Television Branch with primary operating responsibility for the matter was Paul Gordon. He advised that prior to the

---

sion that these comments provide no evidence that Hundt discussed the Rainbow matter with Jordan.

**8.** The chief of the Video Services Division, Barbara Kreisman, told the FCC inspector general that "as a result of the meeting ... she was concerned about two things mentioned by Rainbow in the meeting: the time period given Rainbow to construct and the money spent to date by Rainbow." JA 339. Gordon also stated that he

based the letter reversing the permit cancellation on Stewart's comments at the meeting. JA 338.

**9.** *ATX* specifically considered the impact of congressional *ex parte* interference in the administrative process. *See* 41 F.3d at 1528 ("We are concerned when congressional influence shapes the agency's determination of the merits.") The same analysis is appropriate here in light of Cook's staff position with the Senate subcommittee. *See* JA 294, 297.

June 18, 1993 letter [cancelling Rainbow's permit], Margot Polivy, Rainbow's attorney, would call him from time to time and try to discuss the merits of the proceeding. Mr. Gordon believed that the proceeding was restricted and he would cut her off when she got beyond a discussion of the status of the matter and told her he couldn't discuss the merits because it was a restricted proceeding. She believed that it was not a restricted proceeding because Press had no standing to oppose the Rainbow application.

JA 337.

Gordon described the contacts in more detail under oath:

> She [Polivy] would call me up, say, what's going on with this and she would talk with me about the merits, and I would cut her off and say this is, you know, an *ex parte* communication, I considered it restricted. Uh, and she said that she didn't consider it restricted ... and I said, well, you may say that but, you know, I, I'm working under the assumption that it's a restricted, uh, case, uh, so that was both before and after the June 18th letter.

JA 285.

The FCC concluded that Rainbow may have believed that the *ex parte* restrictions did not apply because FCC precedent did not clearly establish whether Press's informal objection and petition for reconsideration were sufficient to make the proceeding restricted. 9 F.C.C.R. at 2843–45. Even assuming the uncertainty of FCC precedent, however, the Commission's repeated notice to Polivy that it considered the proceedings restricted should have cautioned Rainbow about any belief to the contrary.

■ We further conclude that substantial and material questions of fact exist regarding Rainbow's representations, contained in its January 1991 extension request, about its financial qualifications and failure to construct. Rainbow stated that it required an extension because "[a]ctual construction has been delayed by a dispute with the tower owner which is the subject of legal action in the United States District Court for the Southern District of Florida." JA 45 (cita-

tion omitted). In Press's view the statement was grossly inaccurate because Rainbow had initiated the tower litigation and was in no way precluded from beginning construction by its pendency. The issue is material because the tower dispute was Rainbow's sole basis for its petition. *See id.* Although we have recognized that questions of misrepresentation are ordinarily within the province of the Commission, *American Message Centers v. FCC,* 50 F.3d 35, 41 (D.C.Cir.1995), the FCC's conclusion that no material question of fact existed because "Rainbow did not ... represent to the Commission that the tower dispute precluded it from constructing," 9 F.C.C.R. at 2847, is so flatly inconsistent with the clear import of Rainbow's representation as to require further proceedings.

The same is true of Rainbow's representations regarding its financial qualifications. The district court in the tower litigation found that "Rainbow ... has not obtained any financing commitment for the project." 766 F.Supp. at 1145. The FCC nonetheless concluded that Press had not raised a question requiring hearing because the testimony in the tower litigation had represented only "predictive judgments—not factual statements—as to obstacles Rainbow would face." 9 F.C.C.R. at 2848. But the district court's conclusion was not predictive—it found that Rainbow had *no* financing whatsoever. 766 F.Supp. at 1145. As Press further noted in its opposition, Rey testified that he had no written loan agreements and had only spoken about potential loans with one person. JA 144 n. 2. We will thus remand all three questions regarding Rainbow's conduct to the Commission for further consideration.

## C. *The Merits*

■ The FCC granted Rainbow's application to extend its construction permit because in its view "Rainbow was not afforded the normal 24–month construction period" provided by 47 C.F.R. § 73.3598 and thus did not need to make the showings ordinarily required of applicants by its regulation governing permit extensions, 47 C.F.R. § 73.3534. 9 F.C.C.R. at 2846. We agree

with Press that the FCC's action was inconsistent with the plain language of its rules.

The rule providing for a 24-month construction period manifests that the period runs from the date of the *original* permit, not of actual construction or of any subsequent extension:

> Each original construction permit for the construction of a new TV broadcast station, or to make changes in an existing station, shall specify a period of no more than 24 months *from the date of issuance of the original construction permit* within which construction shall be completed and application for license filed.

47 C.F.R. § 73.3598(a) (emphasis added). Rainbow's original construction permit was issued on April 22, 1986. JA 19. Thus, Rainbow was unquestionably required to apply and qualify for an extension. The regulation governing extensions provides:

> (b) Applications for extension of time to construct broadcast stations ... will be granted only if one of the following three circumstances have occurred:
>
> (1) Construction is complete and testing is underway looking toward prompt filing of a license application;
>
> (2) Substantial progress has been made *i.e.*, demonstration that equipment is on order or on hand, site acquired, site cleared and construction proceeding toward completion; or
>
> (3) No progress has been made for reasons clearly beyond the control of the permittee (such as delays caused by governmental budgetary processes and zoning problems) but the permittee has taken all possible steps to expeditiously resolve the problem and proceed with construction.

47 C.F.R. § 73.3534. The FCC must address whether Rainbow has made the required showing of progress under subsections (b)(1) or (b)(2) or of hardship under subsection (b)(3); that question may turn on the disputed issue whether the tower litigation precluded Rainbow from beginning construction. Although the Commission asserts that it has not required a showing in the past, 9 F.C.C.R. at 2846 & n. 36, it referenced only a single case which, as Press

correctly notes, did not involve an adjudicatory determination but an administrative extension resulting from a rule amendment. *See WLTK (TV) (TV–8, Inc.),* 2 F.C.C.R. 1218 (1987). We conclude that the Commission's decision arbitrarily relieved Rainbow of its obligations under the regulation.

We finally note that the record is factually inconsistent with the FCC's determination that "the period during which Rainbow's sixth extension application was pending should not be counted as part of its two-year construction period." 9 F.C.C.R. at 2846. The FCC explained "it would have been unreasonable to have required Rainbow to make further expenditures and proceed with construction efforts before the Commission granted its sixth extension request." The record establishes, however, that Rainbow did not suspend its efforts in the belief that Commission action on its extension application was necessary for it to proceed.

Rainbow continued construction work on its transmitter building for three months after the expiration of its permit authority in August 1991 until the building was completed, JA 129, and filed a supplement to its extension application well after the expiration of its permit, attempting to bring its tardy efforts to the Commission's attention. *Id.* Further, Rainbow's April 1993 letter explaining its subsequent inaction and its July 1993 petition for reconsideration both indicate that Rainbow believed it was awaiting FCC action on its request to restructure its ownership, not on its petition to extend its construction permit. *See* JA 170 ("In the absence of Commission action, Rainbow cannot use the funds committed to the partnership."); JA 200–01 ("Rainbow's claim ... is that the Commission's failure to act on its pro forma assignment requests in the normal course ... left the applicant unable to go forward...."). The FCC's grant of Rainbow's petition was thus based on a faulty factual foundation that must be addressed on remand.

For the foregoing reasons, we grant the petition for review and remand to the full

Commission for it to conduct further pro-
ceedings consistent with this opinion.

*So ordered.*