# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 14, 2010          Decided May 28, 2010

No. 08-1373

JAMES LICHOULAS, JR.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

*Brian A. Davis* argued the cause for the petitioners. *Kenneth L. Wiseman*, *Mark F. Sundback*, *Gia V. Cribbs* and *Jennifer L. Spina* were on brief.

*Jennifer S. Amerkhail*, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondent. *Thomas R. Sheets*, General Counsel, *Robert H. Solomon*, Solicitor, and *Carol J. Banta*, Attorney, were on brief.

Before: HENDERSON, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: James Lichoulas, Jr. petitions for review of Federal Energy Regulatory Commission (FERC or Commission) orders that terminate his

license to operate a hydropower project attached to a historic six-story mill building in Lowell, Massachusetts. Lichoulas argues that FERC's use of the implied surrender doctrine to terminate his license was arbitrary and capricious. He also argues that FERC engaged in impermissible ex parte contacts and abused its discretion in denying him an evidentiary hearing. Unpersuaded, we deny the petition.

I.

In 1986 FERC issued Lichoulas a license "to construct, operate and maintain the Appleton Trust Project" (Project) under Part I of the Federal Power Act (FPA), 16 U.S.C. §§ 791a *et seq*. *James Lichoulas*, Order Issuing License (Minor Project), 36 F.E.R.C. ¶ 62,047, 63,133 (July 18, 1986). The Project was designed to generate up to 346 kilowatts of electricity when water from the Hamilton Canal passes through two turbine-generators on its way to the Lower Pawtucket Canal.

In a letter to Lichoulas dated March 6, 1997[1] FERC noted that the Project had been inactive since January 6, 1996. It requested that he submit plans for future operation by May 15, 1997. In June 1997, before Lichoulas responded, a fire damaged the property on which the Project is located. Despite the damage, on September 22, 1997 Lichoulas told FERC the Project would be "up and running" near the end of March 1998. Letter from James T. Lichoulas, Jr., Appleton Trust, to Victoria Kaye, FERC. In a March 24, 1998 letter to FERC, however, Lichoulas pushed back the target date to Summer 1998.

FERC followed up on March 2, 1999, writing to Lichoulas that he had failed to keep the Commission updated and requesting that he do so before April 16, 1999. Receiving no

---

[1]While the letter was addressed to the "Appleton Trust," the entity through which Lichoulas obtained the Project license, we do not hereinafter distinguish between Lichoulas and Appleton Trust.

response, FERC sent Lichoulas a letter on July 8, 1999 expressing "uncertainty" that he would ever resume operation. Letter from Hossein Ildari, Chief, Engineering Compliance Branch, FERC, to James Lichoulas at 1. It requested that Lichoulas submit within forty-five days either a plan for resuming operation or "a petition for the voluntary surrender" of his license. *Id.* Fifty-seven days later, on September 3, 1999, Lichoulas responded with an itemized repair plan and an estimated completion date of February or March 2000. FERC approved his plan on October 27, 1999.

In October 2000, approximately seven months after Lichoulas's estimated date of resumed operation, he arranged with the city of Lowell (City) to demolish several buildings on or adjacent to the Project property that posed a potential fire hazard. The demolition exposed asbestos, of which remediation began in August 2001.

FERC staff visited the Project on July 24, 2002 and saw its roof caved in and debris littering its works. They also learned that, while the Project had recently generated power "for a short time," it "had to be shut down due to vibrations." Letter from Anton J. Sidoti, Regional Engineer, FERC New York Regional Office, to James Lichoulas, Jr. at 1 (July 31, 2002). In a letter dated July 31, 2002 FERC requested that Lichoulas provide a repair schedule within ten days. Lichoulas made a progress report forty-seven days later, on September 16, 2002, stating that the Project would be operable by March 2003. But he soon revised his estimate to May 2003. In a March 17, 2003 letter FERC responded, "As you have been previously advised, failure to operate the project is a violation of the terms and conditions of your license." Letter from Anton J. Sidoti, Regional Engineer, FERC New York Regional Office, to James Lichoulas, Jr., Appleton Trust. It told him to resume operation by May 30, 2003 and provide a status report to FERC by June 15, 2003.

In a letter dated September 5, 2003 FERC told Lichoulas he had failed to comply with its March mandates. It said he was in violation of section 10(c) of the FPA. *See* 16 U.S.C. § 803(c) ("licensee shall maintain the project works in a condition of repair adequate . . . for the efficient operation of said works in the development and transmission of power"). Accordingly, it said, "the Commission may revoke your license or take other enforcement actions." Letter from Hossein Ildari, Division of Hydropower Administration and Compliance, to James Lichoulas, Jr. at 2 (Sept. 5, 2003). It told Lichoulas he could stave off such action by filing "a plan and schedule for the resumption of project operation" within twenty-one days. *Id.* at 1. Lichoulas responded approximately six months later, telling FERC staff by telephone that he would submit a plan to resume operation by March 26, 2004. But FERC received no such plan and its subsequent telephone calls went unanswered and unreturned. Thus, on September 23, 2004, FERC told Lichoulas:

> Since you have not made the necessary repairs to your project to resume operations and the project has not operated regularly since November 1994, pursuant to standard article 16 of your license and section 6.4 of the Commission's regulations, we consider the project to be abandoned and that it is your intent to surrender your license. Thus, the Commission may terminate your license under an implied surrender proceeding.

Letter from John Estep, Division of Hydropower Administration and Compliance, to James Lichoulas, Jr. at 1.

Lichoulas responded in a letter dated December 1, 2004. He apologized for the "lack of proper response regarding the status" of the Project. Letter from James T. Lichoulas, Jr. to Secretary, FERC (Dec. 1, 2004). He said "[t]he primary problem was that the [Project property] ha[d] been undergoing a major selective demolition . . . . During that process, asbestos

was discovered. The asbestos removal and clean up process went on and on for the last several years." *Id.* He said it was his "plan to understand [sic] and develop a full scope of work by early March 2005." *Id.* According to FERC, however, "Lichoulas never submitted this information." *James Lichoulas Jr.*, Order Terminating License by Implied Surrender, 124 F.E.R.C. ¶ 61,255, ¶ 12 (Sept. 18, 2008) (Termination Order).

In July 2006 FERC received notice that in April 2006 the City had obtained the Project property by eminent domain as part of an "Urban Revitalization and Development Plan." *See* Letter from Stephen Crane, Urban Renewal Project Manager, to Magalie Roman Salas, Secretary, FERC (July 20, 2006). According to the City, at the time of the taking the Project was not functioning; "in fact," it said, "the entire property [wa]s in a significant state of disrepair." *Id.*

On March 23, 2007 FERC issued Lichoulas a "Notice of Termination of License by Implied Surrender and Soliciting Comments, Protests, and Motions to Intervene." Docket No. P-9300-017 (Mar. 23, 2007). Lichoulas protested on April 19, 2007, arguing that the Project's dormancy did not reflect an intent to abandon or surrender it but instead resulted unavoidably from the demolition, the asbestos remediation and the City's exercise of eminent domain. To establish his intent to restore the Project to operation, Lichoulas submitted a letter of intent between him and an engineering firm providing for the rehabilitation of the Project if he retained his FERC license and regained the property from the City. He also represented that he had a bank line of credit ready to finance the rehabilitation. He asked FERC to hold an evidentiary hearing to explore these and other facts.

At the same time, Lichoulas fought the City's taking of the Project property. In April 2007 he filed a lawsuit in the United States District Court for the District of Massachusetts alleging the taking violated the FPA because the property contained a

FERC-licensed hydropower project. *Lichoulas v. City of Lowell*, Mem. of Decision and Order, C.A. No. 07-10725-RWZ, at 1 (D. Mass. Mar. 31, 2008) (D. Mass. Order). The district court dismissed the claim "without prejudice to plaintiff refiling th[e] action after the conclusion of the FERC proceedings." *Id.* at 5-6 (capitalization omitted). The First Circuit affirmed. *Lichoulas v. City of Lowell*, 555 F.3d 10, 14 (1st Cir. 2009). Lichoulas filed a similar suit, including a *lis pendens* motion, in Massachusetts state court in March 2009. *Lichoulas v. City of Lowell*, Order Den. Pl.'s Mot. for *Lis Pendens* and Allowing Def.'s Mot. to Dismiss, No. 09-MISC-396099-KFS, 2009 WL 1639726, at *1 (Mass. Land Ct. June 11, 2009) (Mass. Land Ct. Order). The state court dismissed the case for lack of subject matter jurisdiction. *Id.* at *3.

Meanwhile, over the course of 2008, while working through the implied surrender process, FERC received communications from the office of U.S. Congresswoman Niki Tsongas, in whose district the Project lies. Tsongas sent letters in March and July requesting procedural updates, which FERC provided. Also, on August 6, Tsongas herself telephoned FERC's Acting Director of External Affairs. Later on August 6, Tsongas's office sent the Acting Director an email with a memorandum attached. The memorandum was addressed to Tsongas from one of her staff. It recommended that the Congresswoman call FERC to "put pressure on the Commission to either (a) provide an update on the timetable for issuing the Order which terminates [Lichoulas's] License, or (b) promptly issue an Order which terminates the license." Mem. from Kate to NT at 1 (attached to email from Brian Martin, District Director, Office of Congresswoman Niki Tsongas, to Patricia Schaub, FERC (Aug. 6, 2008)) (Tsongas Memo). According to FERC, the email with attachment was placed in its "non-decisional record" of this matter. *James Lichoulas, Jr.*, Order Den. Reh'g, 125 F.E.R.C. ¶ 61,195, ¶ 21 (Nov. 20, 2008) (Order Den. Reh'g). The Office of External Affairs received another email from Tsongas's office

on August 18, which, according to FERC, merely "ask[ed] about the status of the case" and it responded accordingly. *Id.*

On September 18, 2008 FERC terminated Lichoulas's license. Termination Order, 124 F.E.R.C. ¶ 61,255. It concluded that he had impliedly surrendered the license pursuant to 18 C.F.R. § 6.4 and standard license article 16. *Id.* ¶¶ 18-26; *see* Form L-15, Terms and Conditions of License for Unconstructed Minor Project Affecting the Interests of Interstate or Foreign Commerce, 54 F.P.C. 1792, 1888 (1975) (Article 16). The order also denied his request for an evidentiary hearing. Termination Order, 124 F.E.R.C. ¶ 61,255, ¶ 24. Lichoulas then requested rehearing and FERC denied that request on November 20, 2008. Order Den. Reh'g, 125 F.E.R.C. ¶ 61,195. It repeated its conclusions that he had impliedly surrendered his license and that an evidentiary hearing was unnecessary. *Id.* ¶¶ 12-17. It also rejected his argument that FERC's contacts with Tsongas's office were prohibited communications, stating that they were "[p]rocedural inquiries." *Id.* ¶ 21 (alteration in original). Lichoulas timely petitioned this court for review. *See* 16 U.S.C. § 825*l*(b).

## II.

Lichoulas argues that we should vacate the Termination Order and the Order Denying Rehearing because (1) FERC's implied surrender determination was arbitrary and capricious, (2) FERC engaged in prohibited "off-the-record communications" while adjudicating the matter and (3) FERC abused its discretion by denying him an evidentiary hearing. FERC contests all three arguments and also maintains we are without jurisdiction to review its action because Lichoulas lacks Article III standing. We address standing first and then reach, *seriatim*, Lichoulas's three arguments.

### A.  Standing

To have standing Lichoulas must show injury in fact, causation and redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009); *Sierra Club v. EPA*, 292 F.3d 895, 898-900 (D.C. Cir. 2002). FERC argues Lichoulas cannot show redressability because "he has already, separately, lost ownership of and access to the Project." Resp't's Br. 23.  It asserts that "Lichoulas has offered no reason to believe that reversal of the license termination would cause the City to return the Project property to him or otherwise to allow him access to repair and operate the Project." *Id.* at 24.  Because the City obtained the Project property by eminent domain, it argues, reversal of FERC's orders will not yield the redress Lichoulas seeks.

FERC's argument fails because it addresses the wrong injury.  The injury of which Lichoulas complains here is the termination of his license to operate the Project.  FERC directly caused this injury and we can redress it by vacating its orders. Lichoulas does not challenge his "lost ownership of and access to the Project" here; he challenged that injury in separate suits regarding the City's exercise of eminent domain. *See Lichoulas v. City of Lowell*, C.A. No. 07-10725-RWZ (D. Mass.); *Lichoulas v. City of Lowell*, No. 09-MISC-396099-KFS (Mass. Land Ct.).  The crucial question here is whether granting his petition would redress the injury *caused by FERC*—namely, the termination of Lichoulas's license.  Plainly it would.  Indeed, "if the complainant is 'an object of the action (or foregone action) at issue'—as is the case . . . nearly always in review of an adjudication—there should be 'little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Sierra Club*, 292 F.3d at 900 (quoting *Defenders of Wildlife*, 504 U.S. at 561-62).

Moreover, that FERC's license termination has caused Lichoulas injury is clear because of its effect on his prospects for regaining ownership of and access to the Project. "'A significant increase in the likelihood that the [litigant] would obtain relief that directly redresses the injury suffered' will suffice for standing." *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 7 (D.C. Cir. 2005) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)). In his eminent domain litigation, Lichoulas argued the City's taking violated the FPA because he holds a valid FERC license. *See Lichoulas*, 555 F.3d at 12; D. Mass. Order at 1; Mass. Land Ct. Order, 2009 WL 1639726, at *3. Accordingly, both the federal and state courts in Massachusetts have noted that the resolution of Lichoulas's petition to us will have a significant impact on his eminent domain challenges. D. Mass. Order at 4 ("[T]he validity of [Lichoulas's] license lies at the heart of this case."); Mass. Land Ct. Order, 2009 WL 1639726, at *2 ("[T]he issue at the heart of this dispute is whether Plaintiff's FERC license was valid at the time of [the] taking . . . . If Plaintiff is successful before the DC Circuit, then his challenge to Defendant's taking will lie under the FPA."). Thus, should Lichoulas succeed here, he will significantly increase the likelihood of prevailing in his eminent domain challenges and therefore make it more likely that he will regain "ownership of and access to the Property." This suffices for redressability and ultimately, because injury in fact and causation are not in question, for standing.[2]

---

[2]FERC's invocation of *Klamath Water Users Ass'n v. FERC*, 534 F.3d 735 (D.C. Cir. 2008), does not affect our conclusion. In that case, an electricity customer challenged FERC's decision that a utility's license did not restrict its rates. *Id.* at 737. We held that the customer lacked standing because California's and Oregon's utility commissions, not FERC, controlled the rates and thus a favorable ruling by us would not provide redress. *Id.* at 740. Thus, that was not a case where "an order directed to [FERC would] significantly

## B. Implied Surrender

We turn to Lichoulas's challenge to FERC's termination of his license via the implied surrender doctrine. We review a FERC order under the familiar "arbitrary and capricious" standard. *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 256 (D.C. Cir. 2007); *see* 5 U.S.C. § 706(2)(A). "Under this deferential standard, we must affirm the Commission's orders as long as it has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Wis. Pub. Power*, 493 F.3d at 256 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alterations in original) (internal quotations omitted). In applying this standard, we defer to the Commission's reasonable application of its precedent but will not approve an unreasoned departure therefrom. *Williams Gas Processing - Gulf Coast Co. v. FERC*, 373 F.3d 1335, 1341 (D.C. Cir. 2004).

FERC regulations and the standard articles of Lichoulas's license provide for implied surrender. Specifically, 18 C.F.R. § 6.4[3] provides that if a licensee

> shall cause or suffer essential project property to be removed or destroyed, or become unfit for use, without replacement, or shall abandon, or shall discontinue good faith operation of the project for a period of three

---

increase the chances of favorable action by a non-party" because there was no reason to think that FERC's decision would affect either state's decision. *Id.*

[3]18 C.F.R. § 6.4 applies to projects, like Lichoulas's, "of not more than two thousand horsepower installed capacity." 16 U.S.C. § 803(i); *see* 18 C.F.R. § 6.4; Order Issuing License, 36 F.E.R.C. ¶ 62,047.

years, the Commission will deem it to be the intent of the licensee to surrender the license.

Article 16 of the license contains language virtually identical to section 6.4 and, in addition, provides for implied surrender if the licensee "shall . . . refuse or neglect to comply with the terms of the license and the lawful orders of the Commission." 54 F.P.C. at 1888; *see* Order Issuing License, 36 F.E.R.C. ¶ 62,047, 63,134 (license "subject to the articles set forth in Form L-15 (October 1975) . . . except Article 15").

FERC's application of implied surrender has evolved over time. In 1993 it noted that it had "only rarely had to resort to the implied-surrender procedure to address a licensee's failure to live up to the obligations of its license." *Mont. Power Co.*, 62 F.E.R.C. ¶ 61,166, 62,143 (1993). In a footnote, it elaborated that "[s]uch cases have included situations where licensees had abandoned project operation a number of years earlier, had sold the project without prior Commission approval and then been dissolved as a corporate entity, or had otherwise abandoned the project facilities and could not be located." *Id.* at 62,143 & n.41. Those examples proved to be less than comprehensive, however, when in 1999 the Commission applied the doctrine in *Fourth Branch Assocs. (Mechanicville) v. Niagara Mohawk Power Corp.*, 89 F.E.R.C. ¶ 61,194, 61,597-98 (1999), *reh'g denied*, 90 F.E.R.C. ¶ 61,250 (2000), *pet. for rev. denied*, 253 F.3d 741 (D.C. Cir. 2001). In that case, two FERC licensees were "at loggerheads" after the collapse of several agreements regarding their joint hydropower project. *Id.* at 61,596. Niagara Mohawk Power Corporation (Niagara Mohawk) wanted to transfer or surrender the license. *Id.* Fourth Branch Associates (Fourth Branch) wanted to continue as a licensee and "restore the project to full operation." *Id.* at 61,592. FERC found implied surrender. *Id.* at 61,598. It first noted that "[t]he doctrine has typically been invoked when the licensee, by action or inaction, has clearly indicated its intent to abandon the

project, but has not filed a surrender petition." *Id.* at 61,597. But it also made clear that "the key element is the licensee's failure to live up to the obligations of its license." *Id.* at 61,597-98. It noted that Fourth Branch lacked financing, did not own the project property and had been evicted from the site. *Id.* at 61,593. Thus, FERC concluded that, because "Niagara Mohawk d[id] not want to operate the project, and [Fourth Branch's] desire to continue as a licensee [wa]s evidently not matched by an ability to carry out the license terms," implied surrender applied. *Id.* at 61,598. FERC recently reaffirmed this expanded application of the doctrine, stating "the key element [of implied surrender] is the licensee's failure to live up to the obligations of its license, and we have implied surrender even where the licensee has expressed an interest in continuing to operate the project." *John C. Jones*, 123 F.E.R.C. ¶ 61,053, ¶ 13 (Jan. 23, 2008).

Here, FERC determined that Lichoulas's actions and—more important—inaction manifested that he had "abandoned good faith operation of his project" and thus impliedly surrendered his license. Termination Order, 124 F.E.R.C. ¶ 61,255, ¶ 25; *see* 18 C.F.R. § 6.4; Article 16, 54 F.P.C. at 1888; Order Den. Reh'g, 125 F.E.R.C. ¶ 61,195, ¶14. It cited over a decade of project dormancy as well as Lichoulas's consistent failure to meet his repair schedules or even timely respond to the Commission's inquiries. Termination Order, 124 F.E.R.C. ¶ 61,255, ¶ 20; Order Den. Reh'g, 125 F.E.R.C. ¶ 61,195, ¶ 14 n.19. It also noted that the City's taking of the Project property "makes any possibility of repairing the project and resuming operations even less likely." Termination Order, 124 F.E.R.C. ¶ 61,255, ¶ 21. Lichoulas counters that his inchoate efforts to repair the Project do not reveal intent to abandon it but instead reflect a series of obstacles beyond his control, including fire, demolition, asbestos abatement and the City's exercise of eminent domain. According to him, "the vast weight of the record evidence is that [he] very much wishes to retain the Project, and is fully capable

of returning it to operation (as he has done in the past) if permitted to do so." Pet'r's Br. 37. In response, FERC maintains that it considered the obstacles Lichoulas identified but they "fail to negate the conclusion that [his] inaction demonstrated a clear intent to abandon the project." Order Den. Reh'g, 125 F.E.R.C. ¶ 61,195, ¶15.

In light of the foregoing, we conclude that FERC's application of the implied surrender doctrine here was not arbitrary and capricious; the Commission "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). The orders reflect reasoned application of FERC's precedent, which makes clear that "the key element" for implied surrender "is the licensee's failure to live up to the obligations of its license," *Fourth Branch*, 89 F.E.R.C. ¶ 61,194, 61,597-98,[4] and that the implied surrender doctrine may be applied "even where the licensee has expressed an interest in continuing to operate the project," *John C. Jones*, 123 F.E.R.C. ¶ 61,053, ¶ 13. Given Lichoulas's consistent unwillingness or inability to meet his own repair schedules or timely respond to FERC, it

---

[4]Lichoulas attempts to distinguish *Fourth Branch* by noting that the licensee in that case had been unable to "obtain the financing necessary to refurbish, expand, and operate the project." Pet'r's Br. 42-43 n.114 (quoting *Fourth Branch*, 89 F.E.R.C. ¶ 61,194, 61,593). He insists that he has financing to complete his repairs and has executed a letter of intent with an engineering firm to carry them out. *Id.* This distinction, however, does not make *Fourth Branch* inapposite. Here, as in *Fourth Branch*, FERC found implied surrender from the licensee's inability or unwillingness to follow through on his commitments to the Commission as a licensee. Conditional agreements with banks and engineers do little to affect that analysis, given Lichoulas's history.

reasonably concluded that he had "abandoned good faith operation of his project." Termination Order, 124 F.E.R.C. ¶ 61,255, ¶ 25; *see* 18 C.F.R. § 6.4; Article 16, 54 F.P.C. at 1888; Order Den. Reh'g, 125 F.E.R.C. ¶ 61,195, ¶14. And while it is true that the Project suffered unforeseen setbacks, the correspondence between Lichoulas and FERC reveals that it was not those setbacks as much as Lichoulas's repeated failure to follow through on his commitments that led to the termination. *See supra* Part I. Thus, on these admittedly unusual facts, we do not believe that FERC's application of the implied surrender doctrine was arbitrary and capricious.

## C. *Ex Parte* Communications

FERC regulations provide that, generally, "no person outside the Commission shall make or knowingly cause to be made to any decisional employee . . . any off-the-record communication."[5] 18 C.F.R. § 385.2201(b). The prohibition does not apply, however, to "[p]rocedural inquiries, such as a request for information relating solely to the status of a proceeding, unless the inquiry states or implies a preference for a particular party or position, or is otherwise intended, directly or indirectly, to address the merits or influence the outcome of a proceeding." *Id.* § 385.2201(c)(5)(i); *see also Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1259 (D.C. Cir. 2004) (ostensibly procedural inquiry "'may in effect amount to an

---

[5]As defined by 18 C.F.R. § 385.2201(c)(4),

Off-the-record communication means any communication relevant to the merits of a contested on-the-record proceeding that, if written, is not filed with the Secretary and not served on the parties to the proceeding in accordance with Rule 2010, or if oral, is made without reasonable prior notice to the parties to the proceeding and without the opportunity for such parties to be present when the communication is made.

indirect or subtle effort to influence the substantive outcome of the proceedings'" (quoting H.R. Rep. No. 94-880, pt. 2, at 20 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2212, 2229)).  If a decisional employee receives an off-the-record communication, FERC must "place the communication [(if written)] or [a] summary [(if oral)] in the public file associated with, but not part of, the decisional record of the proceeding."  18 C.F.R. § 385.2201(f)(2).  FERC must also instruct the source of a written off-the-record communication to serve it on all record parties.  *Id.* § 385.2201(f)(4).  An "off-the-record written communication from a non-party elected official" is not prohibited under the regulations but FERC must place a copy of any such communication in the "decisional record."  *Id.* § 385.2201(e)(1)(iv), (g)(1).

Even if FERC receives an ex parte communication that violates 18 C.F.R. § 385.2201, the court will not undo FERC's action unless "'the agency's decisionmaking process was irrevocably tainted so as to make the ultimate judgment of the agency unfair.'" *Press Broad. Co. v. FCC*, 59 F.3d 1365, 1369 (D.C. Cir. 1995) (quoting *Prof'l Air Traffic Controllers Org. v. FLRA*, 685 F.2d 547, 564 (D.C. Cir. 1982) (footnote omitted)); *see Freeman Eng'g Assocs., Inc. v. FCC*, 103 F.3d 169, 184 (D.C. Cir. 1997). *Press Broadcasting* is particularly instructive. In that case, the FCC reversed its decision to cancel a broadcasting permit after receiving ex parte communications from Senate staff and representatives of the permit holder, which "discussed the substance of the cancellation" and sought advice from FCC officials on how to obtain reversal.  *Press Broad.*, 59 F.3d at 1368.  A competing broadcasting company protested, arguing that the ex parte contacts had tainted the adjudication. *Id.*  Although it was undisputed that the permit holder had violated the FCC's ex parte rules, we held that the contacts were not fatal to the agency's decision because the "contacts extended only to persons who played no role in the Commission's ultimate decision."  *Id.* at 1369.  The contacts had not

"impermissibly 'intruded into the calculus of consideration of the individual decisionmaker'" and had not irrevocably tainted the adjudication. *Id.* at 1370 (quoting *Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*, 714 F.2d 163, 170-71 (D.C. Cir. 1983) (internal quotation marks omitted)). We emphasized that "an improper attempt to influence an adjudication is not a concern if it does not reach the ultimate decision maker" and that "'judicial evaluation of [ex parte] pressure must focus on the *nexus* between the pressure and the actual decision maker.'" *Id.* (quoting *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1527 (D.C. Cir. 1994) (emphasis in original)).

Lichoulas argues that FERC received prohibited off-the-record, ex parte communications from Congresswoman Tsongas and members of her staff.[6] Specifically, he points to an August

---

[6]FERC contends that Lichoulas waived this argument because he did not seek rehearing after the Commission rejected it for the first time in the Order Denying Rehearing. Resp't's Br. 40; *see* 16 U.S.C. § 825*l*(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."); *Cal. Dep't of Water Res. v. FERC*, 306 F.3d 1121, 1125 (D.C. Cir. 2002) ("[I]f an order on rehearing modifies the results of the earlier order in a significant way adverse to a party, that party must seek a rehearing of the order before filing a petition for judicial review."). FERC is wrong. Lichoulas objected to the alleged off-the-record communications in a filing captioned "Response to Off-the-Record Communications and Request for Disclosure of Oral Off-the-Record Communications," dated September 5, 2008, which predated the Termination Order. He repeated his objection in his rehearing request. The Order Denying Rehearing did not "modif[y] the results" of the Termination Order, *Cal. Dep't of Water Res.*, 306 F.3d at 1125; it merely addressed an argument the Termination Order had rejected *sub silentio*. The fact that FERC failed to address his argument in the first instance does not mean he must press it yet again at the agency level.

6, 2008 telephone conversation and an August 18, 2008 email from Tsongas's office. FERC counters that those contacts were "procedural" and thus not "off-the-record communications" under Commission regulations. Order Den. Reh'g, 125 F.E.R.C. ¶ 61,195, ¶ 21. But Lichoulas claims FERC's position is belied by an August 6 email with attachment from Tsongas's office, which references a telephone call, "the purpose [of which] would be to put pressure on the Commission to either (a) provide an update on the timetable for issuing the Order which terminates [Lichoulas's] License, or (b) promptly issue an Order which terminates the license." Tsongas Memo. Lichoulas says this is strong evidence that the August 6 phone call and August 18 email were not procedural but were instead prohibited off-the-record communications under 18 C.F.R. § 385.2201.[7] According to him, "it is clear that the primary purpose of those communications . . . was to put political pressure on FERC to terminate [his] license, which FERC promptly did." Pet'r's Br. 30.

Lichoulas's argument fails because even assuming *arguendo* the challenged contacts violated FERC regulations, there is no indication that they influenced the ultimate decision makers. FERC has stated that "none of the members of the Commission" reviewed the email with attachment before approving the order terminating Lichoulas's license and therefore no member was influenced by it. Order Den. Reh'g, 125 F.E.R.C. ¶ 61,195, ¶ 21 & n.26. And although the Commissioners may have been aware of Tsongas's other contacts, Oral Arg. Recording at 39:14-39:35, without having reviewed the email with attachment they had no reason to

---

[7]Lichoulas does not object to FERC's handling of the email with attachment itself; he concedes that the Commission properly processed them under section 385.2201(f)(2).

conclude that her inquiries were anything but procedural.[8]
Moreover, Lichoulas's charge of improper influence is
undermined by the fact that the first identified contact from
Tsongas's office came in March 2008, while FERC first told
Lichoulas that he had impliedly surrendered his license over
three years earlier, in September 2004. In sum, there is no
indication here of a "nexus" between alleged pressure from
Tsongas's office and the Commission's ultimate decision; nor
is there any indication that Tsongas's contacts "impermissibly
intruded into the [Commission's] calculus of consideration."
*Press Broad.*, 59 F.3d at 1370 (internal quotations and emphasis
omitted). We conclude, therefore, that Tsongas's ex parte
contacts did not irrevocably taint FERC's decision to terminate
Lichoulas's license.

## D. Evidentiary Hearing

"In general, FERC must hold an evidentiary hearing only
when a genuine issue of material fact exists, and even then,
FERC need not conduct such a hearing if [the disputed issues]
may be adequately resolved on the written record." *Cajun Elec.*

---

[8]To the extent Lichoulas suggests the Commissioners were in fact
aware of pressure from Tsongas's office and FERC has prevaricated
or misled the Court, *see* Reply Br. 25-26, we note that

> [i]t would take considerably more than the unsupported
> allegation in a brief to show that the Commission or any one
> of its members failed to act impartially. Under the
> well-settled presumption of administrative regularity, courts
> assume administrative officials "to be men [and women] of
> conscience and intellectual discipline, capable of judging a
> particular controversy fairly on the basis of its own
> circumstances."

*La. Ass'n of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d
1101, 1119 (D.C. Cir. 1992) (quoting *Withrow v. Larkin*, 421 U.S. 35
(1975)) (first alteration added).

*Power Co-op, Inc. v. FERC*, 28 F.3d 173, 177 (D.C. Cir. 1994) (internal citations and quotations omitted) (modification in original). "We review FERC's decision to deny an evidentiary hearing for an abuse of discretion." *Id.*

Lichoulas has not identified any issue he could explore at an evidentiary hearing that could not be adequately addressed on the papers. He argues that a hearing would yield evidence of his subjective intent to restore the Project. But this case involves *implied* surrender, which the Commission decides objectively. *See* 18 C.F.R. § 6.4 ("the Commission will *deem it* to be the intent of the licensee to surrender the license") (emphasis added). At bottom, Lichoulas's complaint is with the legal conclusion FERC has drawn from the facts. An evidentiary hearing is not warranted simply because he disagrees with that conclusion and FERC did not abuse its discretion in declining to provide one.

For the foregoing reasons, we deny Lichoulas's petition.

*So ordered.*