# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 24, 2011         Decided April 29, 2011

No. 10-5101

AERA ENERGY LLC,
APPELLANT

v.

KENNETH LEE SALAZAR, SECRETARY, UNITED STATES
DEPARTMENT OF THE INTERIOR AND UNITED STATES
DEPARTMENT OF THE INTERIOR,
APPELLEES

---

Consolidated with 10-5110

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:08-cv-01614)

---

*Steven J. Rosenbaum* argued the cause for appellants.
With him on the briefs was *Joshua D. Greenberg*.

*Mary Gabrielle Sprague*, Attorney, U.S. Department of
Justice, argued the cause for federal appellees. With her on
the brief were *William B. Lazarus* and *David C. Shilton*,

Attorneys. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In 1999, the Pacific Regional Director of the Interior Department's Minerals Management Service caused four oil and gas leases off the California coast, for which appellants had originally paid the United States over $140 million, to expire. The Regional Director later testified that he based his decision solely on political considerations and that absent such considerations he would have instead extended the leases. Reviewing the matter de novo, however, the Interior Board of Land Appeals, acting without regard to political considerations and on the basis of scientific evidence, affirmed the original decision. The district court upheld that ruling, and appellants now appeal, arguing that in order to cure the Regional Director's original decision of political taint, the Board should have adopted the decision the Regional Director says he would have made absent political influence. Because we agree with the district court that appellants received all they were entitled to—i.e., an agency decision on the merits without regard to extra-statutory, political factors—we affirm.

## I.

Under the Outer Continental Shelf Lands Act of 1953, the federal government has jurisdiction and control over the outer continental shelf, a zone which extends from the edge of state coastal waters to the border of international waters—generally from 3 to 200 miles offshore and covering a total area of some 1.76 billion acres. *See* 43 U.S.C. §§ 1331(a),

1332; Minerals Management Service, *Report to Congress: Comprehensive Inventory of U.S. OCS Oil and Natural Gas Resources* 3 (Feb. 2006), *available at* http://www.boemre.gov/revaldiv/PDFs/FinalInventoryReport DeliveredToCongress-corrected3-6-06.pdf. In recent years, crude oil extracted from the outer continental shelf has represented an increasingly large share of America's domestic oil production, rising from under ten percent in 1981 to nearly thirty percent in 2010. Energy Information Administration, *Crude Oil Production* (2011). Although the vast majority of outer continental shelf oil production occurs in the Gulf of Mexico, a limited amount also takes place off the California coast. *Id.* California's small share is attributable at least in part to two circumstances: that the last California outer continental shelf lease sale occurred in 1984; and that since fiscal year 1991, Congress and the President have imposed a series of moratoria on any new sales. *Samedan Oil Corp. v. Minerals Mgmt. Serv.*, IBLA 2000-142 at 16 (Dec. 5, 2006) ("*ALJ Op.*") (included at J.A. 717). Because all current and future oil and gas production on the California outer continental shelf must in all probability come from leases sold before 1984, the fate of those leases has become quite important to both proponents and opponents of oil and gas drilling off the California coast.

The Outer Continental Shelf Lands Act empowers the Secretary of the Interior to sell and administer oil and gas leases on the outer continental shelf, an authority that the Secretary largely delegated (at all times relevant to this case) to the Minerals Management Service ("MMS"), which in turn delegated most of this authority to its regional offices. 43 U.S.C. §§ 1334(a), 1337(b); 30 C.F.R. § 250.104 (1999); Dep't of Interior, *Departmental Manual*, Part 118, § 5.8 (Apr. 15, 2003); Dep't of Interior, *Department Manual*, Part 118, § 5.9 (Dec. 9, 1996). The Secretary has since abolished the

Minerals Management Service and transferred its Outer Continental Shelf Lands Act responsibilities. Sec'y of Interior, *Secretarial Order 3299* (May 19, 2010). But because that reorganization occurred after the relevant events in this case, we shall refer to MMS's authority as it existed before the reorganization.

Exercising that authority, MMS grants exclusive rights to explore for, develop, and produce oil and natural gas in exchange for an up-front bonus, annual rentals, and royalties on oil and natural gas actually produced for a "primary term" of either five or ten years. 43 U.S.C. § 1337(a), (b). During the exploration stage, production or other operations on the lease may be "suspended" either at the request of the leaseholder or at the Service's direction, which has the effect of extending the lease's term for the suspension period. 43 U.S.C. §§ 1334(a)(1); 1337(b)(5); 30 C.F.R. §§ 250.110, 256.73 (1999). Leaseholders may voluntarily join multiple leases together into "units" by signing "unitization" agreements that must be approved by the Service. 43 U.S.C. § 1334(a)(4); 30 C.F.R. §§ 250.1300, 250.1301(a) (1999). The regulations in effect when the units at issue in this case were created required a unit to

> include the minimum number of leases or portions of leases required to permit one or more reservoirs or potential hydrocarbon accumulations to be served by an optimal number of artificial islands, installations, or other devices necessary for the efficient exploration or development and production of oil and gas or other minerals.

30 C.F.R. § 250.50(b) (1986). In other words, for a lease to belong in a particular unit, the lease must overlie "one or

more [mineral] reservoirs or potential hydrocarbon accumulations." *In re Samedan Oil Corp.*, 173 IBLA 23, 39–40 (2007) ("*IBLA Op.*"). Once a unit has been approved, all leases within the unit are generally extended as one. 30 C.F.R. § 250.1301(g) (1999); MMS's Answer to Aera's Statement of Reasons 4–5, Feb. 26, 2001 (included at J.A. 295–96) (agreeing with Aera that in practice suspension requests have been handled at the unit, rather than the lease level). During the exploration stage, the Service also has authority to "contract" a unit by excluding all or part of one or more leases based on better understandings about the dimensions and qualities of the underlying mineral reservoir. *IBLA Op.*, 173 IBLA at 36, 40 (justifying that interpretation of the appropriate legal criteria for excluding leases from a unit based (1) on the regulations in effect when the units at issue in this case were formed, 30 C.F.R. § 250.50(b) (1987); (2) on the two corresponding unit agreements; and (3) especially on the preamble to the applicable regulations, Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 45 Fed. Reg. 29,280, 29,281 (May 2, 1980), which states in relevant part, "After exploration has been completed, a better delineation of the mineral reservoir will be available, and adjustments prior to development and production may be warranted. In keeping with the minimum area standard, the portions of leased areas that do not overlie the more precisely delineated reservoir should be excluded from the unit area in an adjustment."). If a completely excluded lease's primary term has ended and if no other basis for extending that term applies, then that lease expires upon exclusion from the unit. 30 C.F.R. § 2501.1301(f) (1999). To summarize, a lease's lifecycle begins with its primary term, during which it might be joined together with other leases into a unit, after which all leases within the unit might have operations "suspended" (and so have their terms extended), perhaps even multiple times, until, in some cases, the original lease is excluded—at which

point, assuming both the primary term and any subsequent suspensions have ended, the lease expires. Although this is hardly the only path a lease might follow—indeed many leases are extended by production—it is essentially what happened to the four leases involved in this case.

Their story begins in the early 1980s when Appellant Aera Energy paid $141 million for three of the leases, and Appellant Noble Energy's predecessor paid $1.65 million for the fourth. All four leases were later unitized—Aera's leases became part of the Santa Maria Unit and Noble's became part of the Gato Canyon Unit. Prior to 1999, both units had operations suspended several times, first at the companies' request and then between 1992 and 1999, at the Regional Office's direction as part of a study known as the California Offshore Oil and Gas Energy Resources ("COOGER") study. The COOGER study "was designed to help MMS evaluate the operators' exploration and development plans, as well as to provide local governmental entities in California with information regarding activities on the leased properties." *Amber Resources Co. v. United States*, 538 F.3d 1358, 1365 (Fed. Cir. 2008). During the study period, Dr. J. Lisle Reed, MMS's Pacific Regional Director, ordered the simultaneous suspension of operations for all forty undeveloped California leases—with the last COOGER suspension expiring in August 1999.

Anticipating the end of the COOGER study, Reed informed both Aera and Noble in December 1998 that if they wished to extend their units, they would need to submit new suspension requests, which they did. Then in June 1999, setting in motion the events at issue in this case, Reed told both companies that his office would be evaluating whether any units should be "contracted." Over the ensuing months, Aera and Noble made their case against contraction by

presenting scientific and historical data to the Regional staff. Reed then notified Aera and Noble of his decision: "we have determined that the geological and geophysical data and interpretation no longer support inclusion of [the four leases] within the Santa Maria [and Gato Canyon] Unit[s]." Accordingly, Reed excluded the four leases, causing them to expire. Simultaneously, he granted suspension requests for the remaining leases in each unit.

While Reed was considering the suspension requests, "[California's] Governor, other State and local officials, including California Coastal Commission members, and various Congressional members expressed opposition to or concern over development of the 40 undeveloped California [outer continental shelf] leases, with some advocating for their termination." *ALJ Op.* at 16–17 (included at J.A. 717–18). For example, on June 16, 1999, Senator Diane Feinstein wrote to the Secretary of the Interior to "indicate my strong opposition to any extension by the Minerals Management Service of leases for the 40 undeveloped underwater tracts off the coasts of California . . . and [to] urge [the Secretary] to terminate these leases without any further extensions."

Suspecting that politics had influenced Reed's decision and disagreeing with the negative assessment of the leases' production potential, Aera and Noble appealed to the Interior Board of Land Appeals ("IBLA")—"Interior's review authority charged with deciding, on behalf of the Secretary, matters relating to the use and disposition of public lands and their resources." *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 700 n.1 (D.C. Cir. 2009) (citing 43 C.F.R. § 4.1(b)(3)). The companies offered seven "independent reasons" that Reed's decision "should be reversed as a matter of law" including that the decision was "unduly tainted by impermissible political considerations," that they had received

inadequate notice "that the decision on [their] latest [unit-wide] suspension request[s] would entail a re-evaluation of the prospectivity of individual leases," and that "[t]he [four] leases are highly prospective." Aera and Noble also asked the IBLA to order an evidentiary hearing before an administrative law judge if it found the record inadequate to evaluate these arguments.

The IBLA decided that Reed's "conclusory findings" were "fundamental[ly] flaw[ed]." *In re Samedan Oil Corp.*, 163 IBLA 63, 69 (Sept. 7, 2004). But because it also found that the record required further factual development, it referred Aera and Noble's appeals to an administrative law judge for an independent evidentiary hearing covering not just the evidence considered by MMS at the time of Reed's decision, but also any evidence available to the agency at that time. *Id.* at 70–71; *In re Samedan Oil Corp.*, IBLA 2005-166, IBLA 2005-167, at 2–4 (May 11, 2005). MMS moved for reconsideration, arguing against holding a hearing and suggesting instead a remand to the Pacific Regional Director to issue a new decision. In response, Aera and Noble pressed the IBLA to proceed as planned and to issue a de novo decision based on the administrative law judge's proposed fact findings, which the IBLA ultimately agreed to do.

The administrative law judge held a thirteen day hearing, which focused primarily on the potential for commercial production of oil and gas from the four excluded leases but which also included evidence regarding political influence over the original decision making process. Most significantly for our purposes, Reed testified that his decision was based not on the merits, but on politics. According to Reed, his immediate supervisor told him that it "would be politically very important to cancel some of the tracts" as a show of "good faith to California officials" who vocally opposed

drilling off the California coast. Reed Dep. 10:04:18–36, Mar. 24, 2005 (included at J.A. 362). Excluding the four leases "would help her in carrying on the credibility of the region and her work in Washington." Reed Dep. 11:21:20–26 (included at J.A. 374–75). In particular, she hoped it would "appease[]" California politicians, helping her to preserve the remaining thirty-six undeveloped leases. Reed Dep. 11:22:28–:23:16 (included at J.A. 375–76).

In addition, Reed explained that absent these political considerations, he would have reached the opposite decision—i.e., he would have left the four leases in their units and granted Aera and Noble's suspension requests. Reed Dep. 9:58:12–46, 10:06:10–52, 11:39:46–52 (included at J.A. 361, 363, 379). In saying this, Reed acknowledged that his subordinates, unaware of any political pressure and primarily responsible for analyzing the relevant scientific data, had concluded "that the excluded leases did not qualify for continued inclusion in their respective units . . . [and] that the excluded leases were 'marginal.' " *ALJ Op.* at 19 (included at J.A. 720). Even so, Reed testified "that regardless of the degree of marginality, he would not have removed the leases from their respective units." *Id.* Explaining why he disagreed with his subordinates, Reed said that "cancellation of the leases would result in lost rental revenue for the Government and a lost opportunity for development of possible hydrocarbon accumulations, given his opinion that . . . there was little hope of leasing the tracts again for years in light of the leasing moratorium and political climate." *Id.* In addition, Reed insisted "that the [geological] data was susceptible to different interpretations." *Id.* at 18 (included at J.A. 719).

The administrative law judge found Reed's testimony about whether political considerations played a role in the exclusion decision "convincing[,] . . . unrebutted[,] and . . .

credible." *Id.* But with respect to the leases' geological potential and the propriety of excluding them, the administrative law judge found Reed to be a less reliable witness than his subordinates. *Id.* at 19 (included at J.A. 720). The administrative law judge offered three reasons for this credibility determination: first, "no rule or written policy . . . permits unitization based upon [two of Reed's rationales—] the fact that the Government may lose rental revenue or that a lease may not be released for many years," *id.*; second, "the purpose of unitization is not to extend leases," *id.*; and third, Reed "was less qualified than [his subordinates] by training and relative familiarity with the relevant data to render an opinion on whether the excluded leases should have been removed from their respective units," *id.* In addition, the administrative law judge made extensive findings regarding the exploration histories of the four leases, the companies' future exploration and development plans, and the likelihood that the leases contained potential hydrocarbon accumulations. He concluded that the companies' exploration efforts on the four leases had essentially ended and that based on data collected during that now-completed exploration period, it was unlikely that any of the leases contained potential hydrocarbon accumulations.

The IBLA then issued a final decision in which it adopted the administrative law judge's fact findings. The "key issue" the Board addressed, which had been "the focal point of the hearing proceedings, was whether the evidence available to MMS at the time of the decisions formed a reasonable basis for the decisions to remove the leases from their respective units." *IBLA Op.*, 173 IBLA at 38–39. To answer that question, the IBLA laid out the proper legal criteria for unit contractions. Notably, the IBLA rejected two criteria that Aera and Noble had championed and that Regional Director Reed had testified he would have considered but for politics:

"the potential loss of rental revenue and the minimal likelihood of tract releasing." *Id.* at 37. Instead, the IBLA explained that once exploration is complete, as it essentially was for these four leases, "contraction of a unit area is appropriate if the evidence does not show the requisite strong possibility of the presence of a hydrocarbon accumulation on the excluded leases." *Id.* at 41. Because "[t]he [administrative law] judge's factual findings and the record as a whole *clearly* demonstrate that the excluded leases do not contain potential hydrocarbon accumulations" the IBLA upheld the exclusion decision. *Id.* at 44 (emphasis added).

The IBLA also considered whether the exclusion decisions "were unduly tainted by impermissible political considerations." *Id.* at 38. The Board first observed that "Dr. Reed did not review or evaluate the data himself, but relied on the analysis of his staff who were not instructed that the excluded leases needed to be terminated or that any particular result was desired and who reached the decision that the leases should be excluded based strictly on the seismic, well log, and other geological and geophysical data" and that "MMS's technical staff was more qualified than Dr. Reed by training and relative familiarity with the relevant data." Based on those observations, the Board concluded "that the decision-making process and actual decision-makers [i.e., Reed's subordinates] were sufficiently insulated from the political pressure to obviate the need to set aside the MMS's decisions." *Id.* In addition, the IBLA concluded that "the record developed during the hearing process *clearly* supports MMS's decisions to exclude the leases from their respective units." *Id.* (emphasis added). In other words, as discussed above, because Aera and Noble had failed to show a "strong possibility" of hydrocarbon accumulation on the excluded leases based on a fresh and politically untainted evidentiary record, the decision to exclude those leases was correct.

Seeking to overturn the IBLA's decision—which, significantly for the issue in this case, represents Interior's final agency action for the purposes of judicial review, *Orion Reserves Ltd.*, 553 F.3d at 707–08—Aera and Noble brought suit in the United States District Court for the District of Columbia under the Administrative Procedure Act, 5 U.S.C. § 706. Although their complaint included both a political influence claim and allegations that the IBLA's factual findings and choice of legal criteria were arbitrary, capricious, an abuse of discretion, and contrary to law, the companies pursued only the political influence claim at summary judgment. The district court agreed with Aera and Noble that Reed, not his subordinates, was the MMS's actual decisionmaker and that the IBLA therefore erred when it concluded that MMS's original decision had been insulated from improper political influence because that influence did not extend to those subordinates. *Aera Energy LLC v. Salazar*, 691 F. Supp. 2d 25, 33–34 (D.D.C. 2010); *Noble Energy, Inc. v. Salazar*, 691 F. Supp. 2d 14, 21–22 (D.D.C. 2010). Treating that error as harmless, however, the district court granted summary judgment to the Secretary, reasoning that the IBLA, which was not subject to improper political influence, had "authority to stand in the shoes of the Secretary and to review decisions de novo when it finds that those decisions are not properly supported." *Aera Energy*, 691 F. Supp. 2d at 36; *Noble Energy*, 691 F. Supp. 2d at 24; *see also* 5 U.S.C. § 706. By exercising that authority and finding " 'that the leases were properly excluded from the units because they lack the potential hydrocarbon accumulations necessary for continued inclusion in the units[,]' " the IBLA cured the Regional Director's decision of its improper political taint. *Aera Energy*, 691 F. Supp. 2d at 36 (quoting IBLA decision); *Noble Energy*, 691 F. Supp. 2d at 24 (same). Accordingly, the district court upheld the IBLA's exclusion decision.

Aera and Noble now appeal. We review the district court's decision to grant summary judgment de novo. *Novicki v. Cook*, 946 F.2d 938, 941 (D.C. Cir. 1991).

## II.

In support of the claim that they are entitled to have their four leases reinstated, Aera and Noble advance three principal arguments. First, they claim that our precedent required the IBLA to adopt the decision Reed would have made absent political considerations. Second, they contend that under Department regulations and past Board decisions, the IBLA "neither can nor does substitute its judgment and discretion for that of the administrative decision maker—here, the MMS Regional Director," Dr. J. Lisle Reed. Pet'r's Br. 48. Finally, the companies argue that the IBLA erred when it treated Reed's subordinates instead of Reed as MMS's actual decisionmaker.

We agree with Aera and Noble that Reed was the relevant decisionmaker for MMS's original decision and that in concluding otherwise, the IBLA erred. But the Board offered an independent basis for rejecting the companies' political influence claims, and if that alternative is adequate, then, as the district court found, the Secretary's error was harmless. *See* 5 U.S.C. § 706. We thus turn to Aera and Noble's first two arguments, which challenge the adequacy of the alternative basis for the Board's decision.

The Secretary urges us to bar Aera and Noble from pursuing either argument because "[d]uring the administrative appeal proceeding, [the companies] expressly and repeatedly requested an evidentiary hearing before an [administrative law judge] and a de novo decision by the IBLA." Resp't's Br. 57. We agree with the Secretary that because Aera and Noble

successfully convinced the IBLA, over MMS's objections, to order an evidentiary hearing and make a de novo decision and failed to offer an alternative argument about the scope of the Board's authority, it would be unfair to allow Aera and Noble now to advance the clearly inconsistent theory that the IBLA lacked de novo decision making authority. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." (internal quotation marks omitted)); *id.* at 750 (explaining that judicial estoppel may be appropriate when a party's "later position [is] clearly inconsistent with its earlier position[,] . . . the party has succeeded in persuading a court to accept that party's earlier position[, and] the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped" (internal citations and quotation marks omitted)). In any event, we are dubious about that theory given that the Secretary has expressly "reserved" authority to take over and render a final decision about matters arising under the Outer Continental Shelf Lands Act, 43 C.F.R. § 4.5(a)(1); that Department regulations authorize the IBLA to "decide [administrative appeals] *as fully and finally as might the Secretary*," 43 C.F.R. § 4.1 (emphasis added); and that the IBLA "may, on its own motion, refer any case to an administrative law judge for a hearing on an issue of fact," 43 C.F.R. § 4.415 (2004).

That said, the Secretary gives us no basis for barring the companies from pursuing their first theory—that to remove political taint from Reed's decision, the IBLA should have reinstated the four leases, rather than evaluating whether to exclude them from their units. From the very beginning of the administrative appeal process, Aera and Noble identified

improper political influence as an "*independent* reason" to set aside Reed's exclusion decision. Aera's Statement of Reasons 1 (included at J.A. 273) (emphasis added). Indeed, the IBLA itself treated the companies' political influence claim as a separate and distinct issue. *IBLA Op.*, 173 IBLA at 38. That theory is thus best understood as an alternative argument, and a party that presents two "alternative arguments . . . abandon[s]" neither. *See Busse Broad. Corp. v. FCC*, 87 F.3d 1456, 1461 (D.C. Cir. 1996).

With these threshold matters behind us, this case boils down to one issue: when politics has impermissibly infected an agency decision, what steps must the agency take to cure the taint? On this subject, we have several key cases, from which three related principles emerge.

First, political pressure invalidates agency action only when it shapes, in whole or in part, the judgment of the ultimate agency decisionmaker. Thus, in our first political influence case, *D.C. Federation of Civic Ass'ns v. Volpe*, we asked whether "extraneous pressure intruded into the [agency decisionmaker's] calculus of consideration." 459 F.2d 1231, 1246 (D.C. Cir. 1971). Similarly, in *ATX, Inc. v. U.S. Department of Transportation*, we explained that "judicial evaluation of pressure must focus on the *nexus* between the pressure and the actual decision maker" rather than on the pressure alone. 41 F.3d 1522, 1528 (D.C. Cir. 1994). *Volpe* is representative of this principle. There, we overturned the Department of Transportation's approval of the much debated, never-built Three Sisters Bridge between Washington, D.C. and Virginia because Transportation Secretary Volpe had approved the bridge only after Representative Natcher, Chairman of the Subcommittee on the District of Columbia of the House Appropriations Committee, threatened to withhold money for the construction

of the City's subway system unless the bridge was built. *Volpe*, 459 F.2d at 1245–49.

Second, even where political considerations have tainted agency action, we have consistently given the agency an opportunity to issue a new, untainted decision. For example, in *Volpe* we expressly rejected the notion that "remand would be futile . . . since the agency can only repeat the process it purports already to have undertaken: namely, considering the project solely on its merits," *id.* at 1247 n.84, and instead sent the case back to the agency for a new decision. Likewise, in *Koniag, Inc., Village of Uyak v. Andrus*, we concluded that a letter from Congressman Dingell to the Secretary of the Interior had compromised the appearance of impartiality in the Secretary's determination that several Native Alaskan villages were ineligible to take land and revenues under the Alaska Native Claims Settlement Act. 580 F.2d 601 (D.C. Cir. 1978) ("*Koniag I*"). Yet we rejected the remedy that the district court had ordered—reinstatement of "the last untainted decision" within the agency. *Id.* at 604. "[A] remand to the Secretary, rather than a reinstatement of the [untainted] decisions, is the proper remedy," we explained, because even "[a]ssuming the worst—that the letter contributed to the Secretary's decision in these cases—we cannot say that 3 ½ years later, a new Secretary in a new administration is thereby rendered incapable of giving these cases a fair and dispassionate treatment." *Id.* at 611.

We have applied these two principles in cases where politics threatened to or did, as here, intrude on *intermediate* agency decisions. In such situations, so long as the agency successfully insulated its final decisionmaker from the effects of political pressure, we have allowed the agency's final decision to stand—as though we had reviewed, reversed, and remanded the intermediate decision and then received a new

petition for review from the agency's subsequent decision. For example, in *Press Broadcasting Co. v. FCC*, we upheld a Commission decision notwithstanding that the Mass Media Bureau, the office that first decided the issue, was exposed to *ex parte* contacts from a congressional staffer. 59 F.3d 1365 (D.C. Cir. 1995). As we explained, because the Mass Media Bureau had recused itself and because the full Commission, which had not been subjected to any improper influence, then rendered a fresh decision, that decision was free of taint. *Id.* at 1369–70.

Third, our political influence cases emphasize the value of "establish[ing] 'a full scale administrative record which might dispel any doubts about the true nature of [the agency's] action.' " *ATX*, 41 F.3d at 1528 (quoting *Volpe*, 458 F.2d at 1249) (second alteration in the original). We first made this point in *Volpe,* explaining that the agency could "insulate itself from extraneous pressures unrelated to the merits of the question . . . perhaps by compiling a full-scale administrative record, utilizing fully intra-agency review procedures, and consulting with other agencies and planning groups." *Volpe*, 458 F.2d at 1239 n.84. Likewise, in *ATX*, we upheld the Department of Transportation's denial of an application to operate a new airline because the agency's decisionmakers, though aware of vociferous congressional opposition to the application, had "insulated [their] own decision making process" by ordering an evidentiary hearing before an administrative law judge and by "issu[ing] a lengthy opinion based on . . . [and] fully supported by the [administrative] record." 41 F.3d at 1528. These steps ensured the "decision was clear [and] open to scrutiny." *Id.*

Applied to this case, these principles require that we reject Aera and Noble's challenge. Notwithstanding that political considerations concededly drove Reed's decision,

18

Aera and Noble have offered no evidence that political pressure affected the Department's ultimate decisionmaker— the IBLA—or the administrative law judge who issued the proposed fact findings on which the IBLA based its decision. *See Orion Reserves Ltd.*, 553 F.3d at 700 n.1 (noting that an IBLA decision is the Department's final decision). Moreover, at Aera and Noble's urging, the IBLA took just the sort of steps to cure even the appearance of political impropriety that we have encouraged or credited in our previous cases— namely, ordering a formal evidentiary hearing based on evidence known to MMS's Regional office, as well as evidence available at the time of the decision, and then issuing a de novo decision based on that factual record. Granting Aera and Noble the relief they seek—the decision Reed would have made absent political pressure rather than the decision the IBLA did make—would thus thwart the Department's effort to cure the political taint that infected Reed's original decision.

Aera and Noble argue that this case differs from the decisions discussed above in two critical respects. First, the companies point out that none of those cases contains explicit evidence of political taint whereas here Reed himself admits he would have reached the companies' preferred decision absent political considerations. But because the same legal principles apply regardless of whether the political taint is admitted or inferred, it is irrelevant that the evidence of political influence is more direct here than in our previous decisions. And in any event, in several cases the evidence was adequate to convince us that political pressure warranted, or could have warranted, invalidating agency decisions. *See Press Broad.*, 59 F.3d at 1370 & n.9 (noting "we might well have" reversed the agency because of "congressional *ex parte* interference in the administrative process" had the agency not corrected its mistake by issuing a new and untainted

decision); *see also Koniag I*, 580 F.2d at 610–11 (remanding to the agency, in part, because political pressure "compromised the appearance of the Secretary's impartiality"); *cf. Volpe*, 459 F.2d at 1245 (stating the position of the opinion's author (but only for himself) that "the impact of th[e] [political] pressure [was, in that case,] sufficient, standing alone, to invalidate the Secretary's action").

Second, Aera and Noble insist that this case is unique because without political influence the IBLA never would have had the opportunity even to consider "contracting" the companies' units. Given that only "adversely affected" parties can appeal a Regional Director's decision, there would, they emphasize, have been no party to appeal had Reed left the leases in their units and granted the companies' suspension requests. 30 C.F.R. § 290.2. In contrast, our other cases have all had "parties on both sides," making it "inevitable that . . . the lower level official's decision would . . . be appealed" to higher level decisionmakers within the agency. Reply Br. 19 (contrasting this case with *Koniag I*). Moreover, the companies explain that unlike the suspension decisions, which came in response to requests from Aera and Noble, the "contraction" decision was discretionary—that is, Reed had no obligation even to consider it and likely would never have done so but for politics. This too distinguishes our other cases in which "an application for Government approval had been submitted; a decision had to be rendered; and the question was whether political influence tainted the decision." Reply Br. 16 (contrasting this case with *Press Broadcasting* and *ATX*). The companies thus contend that unlike aggrieved parties in our previous cases, they cannot be placed in a politically untainted position unless the agency gives effect to the decision Reed would have made.

Aera and Noble are correct that the circumstances presented here are in certain respects unlike those in our previous cases. But we are unconvinced that these differences warrant adopting a wholly new approach to curing political interference in agency decision making. We have never even hinted that to cure a decision of political taint, an agency must determine, and give effect to, the decision that would have been made had politics not intruded. Indeed, even though *Koniag I* lacks the unique features of this case, the district court there took an approach very much like that advocated by Aera and Noble—namely, reinstatement of a subordinate official's untainted decision—out of concern over the lingering effects of past political interference. *See Koniag, Inc. v. Kleppe*, 405 F.Supp. 1360, 1370–73 (D.D.C. 1975). Although we could have either affirmed the district court or ordered a remedy analogous to the one Aera and Noble now seek—by requiring the Department of the Interior to ascertain and implement the decision the previous Secretary would have made absent politics—we instead gave the new Secretary a chance to issue a fresh untainted decision. *See Koniag I*, 580 F.2d at 610–11. Likewise, in *Volpe* we required an agency redo, rather than an investigation into a politically untainted alternative universe. *See Volpe*, 459 F.2d at 1247 n.84.

This approach makes sense. Were we to adopt the companies' position, anyone believing that politics had influenced an agency decision would presumably demand an evidentiary hearing to determine not only whether politics actually did influence the decision, but also what the decision would have been absent political interference. Such hearings would be both complex and burdensome. More troubling, such an approach would effectively empower officials no longer responsible for the original, politically driven decision—and as in this case perhaps no longer even

employed by the agency—to control agency policy. Undoubtedly, some officials would take such an opportunity to offer a revisionist history, and determining what would have happened but-for political interference would be no easy task. Consider, for example, that applying Aera and Noble's rule in *Koniag* would have meant asking a former Secretary from a different administration who failed to insulate his decision from political influence to dictate the case's outcome, instead of handing the task to the then-incumbent Secretary.

Moreover, accepting the companies' argument would mean forcing the IBLA to adopt a "special" procedure exclusively for political influence cases. After all, the IBLA ordinarily has de novo review authority (or, at least, Aera and Noble are estopped from arguing otherwise, *see supra* 13–14), and "de novo" review ordinarily means that an appellate body provides its *own* answers to questions presented on appeal rather than ones based on what the original decisionmaker would have done. Requiring the IBLA to mechanically impose Reed's hypothetical decision would thus deviate from the Board's ordinary practice. But we have never required a special procedure and instead have encouraged agencies to adapt established internal procedures to render fresh untainted decisions. *See, e.g.*, *Press Broad.*, 59 F.3d at 1370 (concluding that the FCC had cured an earlier, tainted decision because the Commission issued a de novo decision after the tainted agency staff had been recused); *ATX*, 41 F.3d at 1528 (observing that the Secretary of Transportation's decision to order a full-evidentiary hearing was "unobjectionable;" indeed, it "was an appropriate response to [congressional] pressure"). Indeed, in *Koniag* we expressly rejected judicial tinkering with the procedures an agency normally uses to correct its own errors. 580 F.2d at 610–11 (concluding that remand to the Secretary for a new decision

rather than reinstatement of the last, untainted decision within the agency was appropriate).

Finally, applying Aera and Noble's framework would in some cases mean an agency would have to adopt a decision the agency itself considers unlawful. This very case illustrates the problem. The IBLA determined not only that exclusion was appropriate under the correct legal standard, but also that two of the criteria Reed would have relied on to maintain the leases—"potential loss of rental revenue" and "the minimal likelihood of tract releasing"—were impermissible considerations. *IBLA Op.*, 173 IBLA at 37; *ALJ Op.* at 19 (included at J.A. 720). Accordingly, were the IBLA to impose Reed's decision, it would effectively be embracing the very factors it believed were impermissible, a decision we would normally find arbitrary and capricious. *Cf. Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("It is hard to imagine a more violent breach of th[e] requirement [of reasoned decision making] than applying a rule of primary conduct or a standard of proof which is in fact different from the rule or standard formally announced."); *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999) (requiring an agency to conduct notice and comment rulemaking before significantly revising a definitive interpretation of the agency's regulations). Yet that is exactly what Aera and Noble would have us require as a matter of law.

Resisting the significance of the IBLA's determinations, Aera and Noble point out that the Board made no "explicit finding" that Reed's hypothetical decision would have been unlawful and point to purportedly "ample bases for his conclusions" in his testimony. Pet'r's 28(j) Letter 1–2, Jan. 28, 2011. But even assuming some of Reed's rationales would have been appropriate, the companies do not dispute that

Reed would have based his politically untainted decision on considerations the IBLA subsequently determined were inappropriate. In any event, we think it hardly surprising that the IBLA made no "explicit finding" about the lawfulness of a decision Reed never made, particularly given that our case law nowhere even hints that de novo review must include such an inquiry. That said, because the Board made no "explicit finding," we have highlighted the flaws in Reed's decision not as a basis to affirm, but merely to illustrate the bizarre results that embracing the companies' theory could produce.

Of course, this might well have been a different case had the companies also advanced traditional Administrative Procedure Act claims alleging, for example, that the Department violated its own procedural or substantive requirements for "contracting," or even considering whether to contract, a unit. Certainly, courts reviewing agency decisions involving political interference must be attuned to the heightened possibility that political influence will have caused agencies to cut corners. In this case, Aera and Noble made several such arguments to the IBLA, including that there was sufficient evidence that each lease contained mineral deposits to warrant their continued inclusion and that the companies had received inadequate notice that the Regional office would be considering whether to "contract" the units. The Board rejected these arguments. Significantly, it also implicitly rejected any argument that evaluating whether to contract the units at that time would have been improper, explaining that once exploration is essentially complete, as in the case of these four leases, it is appropriate under agency regulations to assess the available scientific evidence to determine whether leases should continue to be included in their units. But because Aera and Noble failed to challenge these conclusions on appeal, we must assume the

procedural and substantive soundness of the Department's decision. Given that assumption, Aera and Noble were entitled to nothing more than what they received—an agency decision on the merits uninfluenced by political considerations.

### III.

We are keenly aware that administrative agencies making important and sometimes controversial decisions are often buffeted by political pressure. Indeed, public advocacy plays a healthy role in our system. Accordingly, "we have never questioned the authority of congressional representatives to *exert* pressure, and we have held that congressional actions not targeted directly at [agency] decision makers—such as contemporaneous hearings—do not invalidate an agency decision." *ATX*, 41 F.3d at 1528 (citing *Volpe*, 459 F.2d at 1249 and *Koniag*, 580 F.2d at 610) (emphasis added). But sometimes political pressure crosses the line and prevents an agency from performing its statutorily prescribed duties. When that occurs, we have repeatedly declined to stand in the agency's shoes and take over its decision making function. Instead, we have directed the agency to use the traditional administrative tools at its disposal to render a politically untainted decision. Such an approach follows from the distinct roles Congress has assigned to administrative agencies and the courts: for agencies, to reach reasoned decisions based on the relevant statutory factors; and for the courts, to ensure that those agencies properly carry out their statutory responsibilities. Having found that the IBLA fulfilled its role, we have fulfilled ours and so affirm.

*So ordered.*