Opinion for the Court filed by Senior Circuit Judge RANDOLPH.
Concurring opinion filed by Senior Circuit Judge WILLIAMS.
RANDOLPH, Senior Circuit Judge:
The Outer Continental Shelf Lands Act authorizes the Secretary of the Interior to sell and administer oil and gas leases on the submerged lands located between state coastal waters and the high seas. 43 U.S.C. §§ 1331(a), 1332, 1337(a). The Act also empowers the Secretary to promulgate rules and regulations governing those leases. Id. § 1334(a). At issue here are regulations obligating lessees to plug permanently and to abandon their oil wells.
On September 1, 1979, Noble Energy[1] acquired a lease to drill for, develop, and produce oil and natural gas on roughly six thousand acres of submerged lands off the coast of California. Pursuant to the lease, Noble drilled an exploratory oil well in 1985—“Well 320-2”—and discovered oil and gas in commercially viable quantities. Before producing any oil or gas, Noble temporarily plugged and abandoned the well, a technique that seals the well but allows for re-entry after additional testing or exploration.[2] See 30 C.F.R. § 250.1721. Twenty-seven years later, Well 320-2 remains temporarily plugged and abandoned.
During the intervening years, suspensions of Noble’s lease were common. A suspension—issued either at the lessee’s request, after agency approval, or at the Interior Department’s directive—has two principal effects: (1) it extends the life of a lease, which typically has an initial term of five years; and (2) it defers the lessee’s obligation to produce oil. 43 U.S.C. §§ 1334(a)(1), 1337(b)(2) & (5); 30 C.F.R. §§ 250.105, 250.169. Interior grants suspensions when, for example, a lessee needs additional time to develop its lease, to obtain transportation facilities, or to negotiate sales contracts. 30 C.F.R. §§ 250.174, 250.175. Absent a threat of immediate or irreparable harm, suspensions generally do *1243 not interfere with a lessee’s ability to explore, develop, or prepare its lease for oil production.
Noble requested and received its last suspension in 1999. Two years into the suspension’s four-year term, a federal district court in California set it aside. The court ruled that suspensions had to comply with the 1990 amendments to the Coastal Zone Management Act, 16 U.S.C. § 1451 et seq. Under those amendments, “[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs.” Id. § 1456(c)(1)(A); see California ex rel. Cal. Coastal Commn’n v. Norton, 150 F.Supp.2d 1046, 1053, 1057 (N.D.Cal.2001), affirmed 311 F.3d 1162, 1173 (9th Cir.2002). Because Noble’s suspension had not been assessed for consistency with California’s coastal management plan, the court ordered it revoked.
For the first time, states and their coastal management programs obtained a degree of influence over the suspension process. This new-found influence arguably made it more difficult for lessees to acquire suspensions. It undoubtedly interfered with ongoing leasehold activities—the government directed many lessees to cease operations pending a review of their prior suspension requests. Noble and other lessees sued in the Court of Federal Claims, alleging that application of the Coastal Zone Management Act to suspension requests constituted a material breach of their lease agreements. The Court of Federal Claims agreed; on appeal the Federal Circuit affirmed. Amber Res. Co. v. United States, 538 F.3d 1358 (Fed.Cir.2008) (affirming 68 Fed.Cl. 535 (2005) and 73 Fed.Cl. 738 (2006)). The courts concluded that the government’s compliance with the California court order made the development of leased property more difficult and the pursuit of suspensions more burdensome. Amber Res., 538 F.3d at 1373-74. Thus, the government had effectively “repudiated the lease agreements by putting into practice the new [court-mandated] rules applicable to the availability of requested suspensions.” Id. at 1370.
The lessees received $1.1 billion in restitution damages and were discharged from all obligations arising from their lease agreements.[3] Noble’s share of the recovery was roughly $1.2 million. Among its discharged contractual duties was the obligation to “remove all devices, works, and structures from the premises no longer subject to the lease.”
This brings us to the current dispute: one year after the Federal Circuit’s decision in the breach-of-contract litigation, the Minerals Management Service, at that time an arm of the Interior Department, sent a letter to Noble ordering it to plug and abandon Well 320-2 permanently. Because this controversy arises directly from that letter, we quote it at length:
The purpose of this letter is to notify you of outstanding decommissioning obligations that exist on one of your OCS leases. Our records indicate that your Well OCS P-0320, No 2, has not been permanently abandoned. The Minerals Management Service (MMS) has deter *1244 mined that there is no longer justification for maintaining the well in temporarily abandoned status. Therefore, as required by 80 CFR 250.1723, you must: promptly and permanently plug the well according to 250.1715; clear the well site according to 250.1740 through 250.1742; and perform any additional activity necessary to fully satisfy your decommissioning obligations.
The total cost of such tasks is estimated at more than $20 million.
Noble responded to the order by explaining “that the Government’s material breach discharged the lessees from any obligation to conduct, arrange or pay for the plugging and abandonment of the 320 # 2 exploratory well.” Its letter to MMS also announced that Noble had sued the Secretary of the Interior and his agency for injunctive and declaratory relief. The suit alleged that the plug and abandon order was arbitrary, capricious, an abuse of discretion, and not in accord with the law. See 5 U.S.C. § 706(2)(A).
The district court first determined, correctly we believe, that it had jurisdiction over Noble’s complaint.[4] Noble Energy, Inc. v. Salazar, 770 F.Supp.2d 322, 328-29 (D.D.C.2011). As to the merits, the court ruled that the common law doctrine of discharge did not relieve Noble of the regulatory obligation to plug its well permanently, an obligation that the lease did not itself create. Id. at 331-32. Our review is de novo. Ne. Hosp. Corp. v. Sebelius, 657 F.3d 1, 4 (D.C.Cir.2011).
Interior’s regulations require that lessees “[pjromptly and permanently plug” their temporarily-abandoned oil wells if the government so orders. 30 C.F.R. § 250.1723. Lessees must in any event “permanently plug all wells on a lease within 1 year after the lease terminates.” Id. § 250.1710; see also id. § 250.1703(b). As with other regulatory duties regarding the outer Continental Shelf, these obligations accrue the moment an entity drills a well or becomes a lessee, id. §§ 250.1701(a), 250.1702(a) & (d), and generally are discharged only when satisfied, id. § 250.1701(a). The obligations expressly survive assignment, id. § 556.62(d); transfer, id. § 556.64(a)(5); and termination of a lease, id. §§ 556.76, 250.1710.
Noble’s argument against application of the regulations proceeds as follows. The government materially breached its lease agreement when it applied the Coastal Zone Management Act to suspension requests. Under the common law rule of discharge, Noble’s remaining contractual obligations were therefore excused, including any contractual duties to plug and abandon Well 320-2. Because federal regulations impose similar decommissioning obligations, and because those regulations exist to govern contractual relationships, the “common law rule of discharge applies *1245 to the regulatory plug and abandonment requirement[s]” as well.
The argument relies in large measure on United States v. Texas, 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993). In that case, the Court held that (1) “[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident,” id. at 534, 113 S.Ct. 1631 (quoting Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952)); and (2) “[i]n order to abrogate a common-law principle, the statute must ‘speak directly’ to the question addressed by the common law,” id. (quoting Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978)). Noble thinks these holdings require common law principles of discharge to “be read into the OCS Lands Act and regulations.”
The government’s main counter-argument is that neither United States v. Texas, nor any of the other cases Noble invokes, holds that “at common law a breach of contract by the United States (or by a private party for that matter) discharges the non-breaching party from compliance with its independent statutory and regulatory obligations.”
Resolution of this dispute depends on what the plugging regulations mean. If the regulations impose an obligation to plug Well 320-2 regardless of the government’s breach of the lease contract, Noble’s argument fails. If the regulations release the duty to plug once the government materially breaches the lease agreement, then Noble prevails. Nothing in § 250.1710, § 250.1723, or any of the agency’s other regulations clearly addresses this question.
It is important to remember that we are considering these regulations in the context of judicial review of agency action under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. The “agency action” here is MMS’s order, or as the government calls it, MMS’s “decision letter.” Section 706 of the APA instructs reviewing courts to “determine the meaning or applicability of the terms of an agency action” when necessary. But with respect to the decision letter, we are unable to perform this duty with any confidence. We know that MMS issued the letter about a year after the Federal Circuit ruled that the government materially breached the lease. What we do not know is whether MMS actually decided that the regulatory obligation to plug Well 320-2 continued post-breach. There is not a word in MMS’s letter indicating that it considered the common law doctrine of discharge. And even if the letter was the result of careful consideration regarding how the regulations operate in light of the Amber rulings, MMS’s letter contains no hint of the agency’s reasoning or the factors that it took into account. We therefore cannot be sure whether MMS’s letter embodied an interpretation of the regulations’ applicability after breach. One might infer this, but as we have said in a similar situation, “an implication is not an agency interpretation.” Menkes v. DHS, 486 F.3d 1307, 1314 (D.C.Cir.2007); see also PDK Labs. Inc. v. DEA, 362 F.3d 786, 798 (D.C.Cir. 2004) (‘Yes, DEA did exercise discretion when it issued the order here, but before doing so it necessarily had to decide what [the provision] meant. That is the issue the agency must reconsider on remand ... so that it can fill in the [interpretative] gap” left unexplained.). Remand therefore is necessary.
Our reluctance to speculate about how MMS interpreted its regulations follows from the principle laid down in a line of cases reaching back at least to Prill v. *1246 NLRB, 755 F.2d 941 (D.C.Cir.1985). Those cases hold that on judicial review this court will not choose between competing meanings of an ambiguous law until the relevant agency weighs in.[5] Id. at 948; see also Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin., 471 F.3d 1350, 1354 (D.C.Cir.2006); Leva Pharm. USA, Inc. v. FDA, 441 F.3d 1, 4 (D.C.Cir. 2006); PDK Labs., 362 F.3d at 798; Arizona v. Thompson, 281 F.3d 248, 259 (D.C.Cir.2002); Transitional Hosps. Corp. of La., Inc. v. Shalala, 222 F.3d 1019, 1029 (D.C.Cir.2000); Alarm Indus. Commc’ns Comm. v. FCC, 131 F.3d 1066, 1072 (D.C.Cir.1997). Put simply, “an agency is entitled to construe its own regulations in the first instance.” Am. Petroleum Inst, v. EPA, 906 F.2d 729, 742 (D.C.Cir.1990) (per curiam). If we cannot tell whether it has done so, remand is appropriate. See Menkes, 486 F.3d at 1313-15; Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm’n, 212 F.3d 1301, 1302, 1304-05 (D.C.Cir.2000); Ohio v. U.S. Dep’t of the Interior, 880 F.2d 432, 461 (D.C.Cir. 1989). Cf. Oil, Chem. & Atomic Workers Int’l Union, AFL-CIO v. NLRB, 46 F.3d 82, 93 (D.C.Cir.1995); Int’l Longshoremen’s Ass’n, AFL-CIO v. Nat’l Mediation Bd., 870 F.2d 733, 735-36 (D.C.Cir.1989).
We acknowledge that judicial deference to an agency’s interpretation of its own regulation may be appropriate even though the interpretation appears for the first time in a legal brief. See Auer v. Robbins, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (giving deference to an interpretation contained in an amicus brief); Drake v. FAA, 291 F.3d 59, 68-69 (D.C.Cir.2002) (adversarial brief). That said, we cannot find any definitive interpretation of the plug and abandon regulations in the government’s bricf. This may be attributable to the fact that MMS was abolished in May 2010—more than a year before the government filed its brief in this proceeding. Aera Energy LLC v. Salazar, 642 F.3d 212, 214 (D.C.Cir.2011) (citing Sec’y of Interior, Secretarial Order 3299 (May 19, 2010)). What we are left with is a brief written by the Department of Justice, defending the actions of a disbanded Interior Department office, without—as far as we can tell—any consideration of the regulations by MMS’s successor. This is not the stuff of Auer deference.
In short, it is up to MMS’s successor to interpret its regulations in the first instance and to determine whether they apply in situations like Noble’s. If they do, the agency must explain why. See Int’l Longshoremen’s Ass’n, 870 F.2d at 735-37. We therefore vacate the judgment and send the case back to the district court with instructions to vacate Interior’s order and to remand to the Secretary for further proceedings consistent with this opinion.

So ordered.

. For ease of reference, we refer to Noble Energy, Inc. and its commercial predecessors as “Noble Energy.”

. In comparison, the permanent plugging and abandonment of a well requires, among other things, the following steps: placing a series of cement plugs in the borehole beneath the sea floor; removing both the wellhead—the pressure containing access point at the sea floor— and large portions of the well's piping; and totally clearing the well site. 30 C.F.R. §§ 250.1715, 250.1716.

. Under the common law rule of discharge, one party's material breach of a contract will excuse the other party’s performance. See Restatement (Second) of Contracts § 237 (1981); Costello v. Grundon, 651 F.3d 614, 640 (7th Cir.2011); 3511 13th Street Tenants’ Ass’n v. 3511 13th Street, N.W., Residences, LLC, 922 A.2d 439, 445 (D.C.2007); see also Amber Res., 68 Fed.Cl. at 548-49.

. Although Noble did not go through any formal process to relinquish its lease, see 30 C.F.R. § 556.76, the district court was ‘'inclined” to agree that the government's material breach had the effect of terminating the lease as a matter of law. This placed Noble’s lawsuit squarely within the provision of the Outer Continental Shelf Lands Act conferring jurisdiction on district courts over "controversies arising out of, or in connection with ... the cancellation, suspension, or termination of a lease or permit under this [Act].” 43 U.S.C. § 1349(b)(1). Additionally, the court concluded that while the Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over claims for more than $10,000 founded on a contract with the United States, Noble's claim, which did not seek monetary relief, turned exclusively on whether MMS had authority to issue the plug and abandon order. The government has not renewed its jurisdictional objection on appeal.

. The actual holding of Prill and the cases following it is this: when an agency incorrectly concludes that Congress mandated a particular regulatory interpretation of a statute— and the agency therefore stops itself at Chevron step one—this court will vacate and remand. Upon remand, the agency is required to bring its experience and expertise to bear in parsing the statute and implementing an appropriate regulatory response. 755 F.2d at 948. While that holding does not apply here, the underlying principle, as explained in the text, clearly does.